**USA PETROLEUM COMPANY,**
Plaintiff–Appellant,

v.

**ATLANTIC RICHFIELD COMPANY,**
Defendant–Appellee.

No. 87–5681.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1987.

Decided Oct. 7, 1988.

Maxwell E. Blecher, Blecher & Collins, Los Angeles, Cal., for plaintiff-appellant.

Ronald C. Redcay, Hughes, Hubbard & Reed, Los Angeles, Cal., for defendant-appellee.

Before ALARCON, NELSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

USA Petroleum Company (USA) sued Atlantic Richfield Company (ARCO) for violations of the Sherman Act, the Robinson–Patman Act, the Cartwright Act, and various state laws. USA subsequently voluntarily withdrew with prejudice its claim under section 2 of the Sherman Act. ARCO

moved for summary judgment on USA's claim under section 1 of the Sherman Act, 15 U.S.C. § 1, and the district court granted its motion. The court entered judgment for ARCO under Fed.R.Civ.P. 54(b), and USA timely appealed. We reverse.

## I.

ARCO is an integrated oil company which, among other things, markets gasoline in the western United States. It sells gasoline to consumers both directly and indirectly through ARCO-brand dealers. USA is an independent marketer of gasoline, which it sells at retail under the brand name USA. USA competes directly with ARCO dealers at the retail level.

USA alleges that ARCO conspired with retail service station dealers selling ARCO-brand gasoline to fix retail prices at below-market levels. USA alleges that "ARCO's strategy was to eliminate the independents by fixing and subsidizing below-market prices and siphoning off the independents' volumes and profits," and that it succeeded in that strategy. According to USA, many independents have been driven out of business. ARCO's subsidies consisted of temporary volume allowances, temporary competitive allowances, and other price allowances extended to its distributors and dealers.

For the purpose of reviewing the district court's summary judgment order, we must assume these allegations to be correct. *See Baker v. Department of Navy,* 814 F.2d 1381, 1382 (9th Cir.1987).

The district court ruled that "[e]ven assuming that [USA] can establish a vertical conspiracy to maintain low prices, [it] cannot satisfy the 'antitrust injury' requirement of Clayton Act § 4, without showing such prices to be predatory. Under the circumstances here concerned ... no such showing can be made." We disagree.

## II.

■ The question on appeal is whether in the absence of proof of predatory pricing a competitor can recover damages because of a maximum resale price maintenance agreement. Specifically, we must decide whether a competitor's injuries resulting from vertical, non-predatory, maximum price fixing fall within the category of "antitrust injury". This is a difficult question, and one of first impression in this circuit. The Supreme Court has not spoken on this issue, and among the circuit courts only the Seventh Circuit has taken a position. *See Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698 (7th Cir.1984), discussed below. The question requires us to look closely at the purposes and policies underlying the antitrust laws, and to determine which application of the doctrine of "antitrust injury" best implements those purposes and policies.

The concept of "antitrust injury" was put forward in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977):

> We therefore hold that for plaintiffs to recover treble damages ... they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

In *Brunswick,* the plaintiffs argued that an illegal merger had kept alive failing competitors. The claim was that a violation of the antitrust laws had prevented the plaintiffs from obtaining monopoly profits. The Supreme Court's decision was not surprising: a plaintiff should not be able to claim damages for being unable to gain a monopoly position, the type of advantage the antitrust laws were meant to prevent. *See id.* at 487–88, 97 S.Ct. at 697. The Court held that when the injury claimed "was not of 'the type that the statute was intended to forestall,'" damages under section 4 of the Clayton Act would not be available. *Id.* (quoting *Wyandotte Co. v. United States,* 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967)).[1] *See Or-*

---

1. One commentator summarized the holding of *Brunswick* as follows:

Even if the plaintiff can show an antitrust violation, courts should allow treble damages

*ion Pictures Distribution Corp. v. Syufy Enters.*, 829 F.2d 946, 948–49 (9th Cir.1987) (no antitrust injury where the injury claimed was caused by a breach of contract, not by the alleged antitrust violation).

### III.

To determine whether the injury USA alleges is of the type the antitrust laws were meant to prevent, we must look first to the Supreme Court's discussions of price fixing under the antitrust laws.

In *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), a case involving horizontal price fixing, the Supreme Court held that price-fixing agreements were *per se* illegal. The Court responded as follows to the argument that the fixing of prices should be legal if the prices fixed were reasonable:

> The reasonableness of prices has no constancy due to the dynamic quality of business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system. But the thrust of the rule is deeper and reaches more than monopoly power. Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive.

*Id.* at 221, 60 S.Ct. at 843. To the argument that the prices had been fixed in such a way as to stabilize the market, the Court stated:

> [I]n terms of market operations stabilization is but one form of manipulation. And market manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone.

> .    .    .    .    .

> Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*

> .    .    .    .    .

> Price-fixing agreements may or may not be aimed at complete elimination of price competition. The group making those agreements may or may not have power to control the market.... Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or poten-

only for injuries reflecting a disruption of competition in the plaintiff's market. From this perspective, *Brunswick* was an easy case. The plaintiffs may well have shown a violation of § 7—the mere possibility that a large firm active in many markets will cut prices or use other monopolization tactics in a new market is enough to show a § 7 violation—but they failed to show that their losses stemmed from the realization of this possibility. The defendant had merely kept afloat businesses that otherwise would have failed. It had not affected prices in any way. The "lost profits" the plaintiffs complained of were the result of the very situation that the antitrust laws are supposed to encourage—free competition among as many firms as a market can support.

Note, "Antitrust Standing, Antitrust Injury, and the Per Se Standard", 93 *Yale L.J.* 1309, 1320 & n. 58 (1984).

tial threat to the central nervous system of the economy.

*Id.* at 223, 225–26 n. 59, 60 S.Ct. at 844, 845–46 n. 59.

The Supreme Court in a later case thought it evident that the rule that price fixing was *per se* illegal extended to the fixing of maximum prices.

The Court of Appeals erred in holding that an agreement among competitors to fix maximum resale prices of their products does not violate the Sherman Act. For such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. We reaffirm what we said in *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223 [60 S.Ct. 811, 844]: "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*"

*Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951).

*Kiefer–Stewart* involved both a vertical maximum price fixing (maximum resale price maintenance) agreement and a horizontal agreement among competitors to impose that price restraint. *Id.* at 212, 71 S.Ct. at 260. When the issue of vertical maximum price-fixing was more directly raised, the Supreme Court affirmed that that form of market manipulation was covered by the *per se* rule against price fixing.

We think *Kiefer–Stewart* was correctly decided and we adhere to it. Maximum and minimum price fixing may have different consequences in many situations. But schemes to fix maximum prices, by substituting the perhaps erroneous judgment of a seller for the forces of the competitive market, may severely intrude upon the ability of buyers to compete and survive in that market. Competition, even in a single product, is not cast in a single mold. Maximum prices may be fixed too low for the dealer to furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay. Maximum price fixing may channel distribution through a few large or specifically advantaged dealers who otherwise would be subject to significant nonprice competition. Moreover, if the actual price charged under a maximum price scheme is nearly always the fixed maximum price, which is increasingly likely as the maximum price approaches the actual cost of the dealer, the scheme tends to acquire all the attributes of an arrangement fixing minimum prices. It is our view, therefore, that the combination formed by the respondent in this case to force petitioner to maintain a specified price for the resale of the newspapers which he had purchased from respondent constituted, without more, an illegal restraint of trade under § 1 of the Sherman Act.

*Albrecht v. Herald Co.*, 390 U.S. 145, 152–53, 88 S.Ct. 869, 873, 19 L.Ed.2d 998 (1968) (footnote omitted).[2]

108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (internal quotes and citations omitted).

With this in mind, the dissent's flat assertion, based on Professor (now Judge) Easterbrook's neo-classical economic views, that "[m]aximum vertical price fixing lacks the potential anticompetitive effects that maximum horizontal price fixing has, and in contrast has the potential for creating a competitive benefit" is simply irrelevant. Dissent at 700–01 (citing Easterbrook, *Maximum Price Fixing*, 48 U.Chi.L.Rev. 886, 890 n. 20 (1981)). To the extent that the Supreme Court's view of this issue differs from Judge Easterbrook's, we are required to apply the former.

---

**2.** The establishment of a *per se* rule against maximum vertical price fixing is more than merely a recognition that the anticompetitive effects of the practice outweigh the procompetitive effects. Dissent at 699 n. 1. Rather, it is a recognition that "such [procompetitive] cases are not sufficiently common or important enough to justify the time and expense necessary to identify them." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 2557 n. 16, 53 L.Ed.2d 568 (1977). Indeed, "*per se* rules are appropriate only for conduct that is manifestly anticompetitive, that is conduct that would always or almost always tend to restrict competition and decrease output." *Business Elecs. Corp. v. Sharp Elecs. Corp.,* — U.S. —,

■ In *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Court refused to withdraw maximum price fixing from the *per se* rule.

> Our decisions foreclose the argument that the agreements at issue escape *per se* condemnation because they are horizontal and fix maximum prices. *Kiefer–Stewart* and *Albrecht* place horizontal agreements to fix maximum prices on the same legal—even if not economic—footing as agreements to fix minimum or uniform prices. The per se rule "is grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition."

*Id.* at 348, 102 S.Ct. at 2475 (brackets in *Maricopa County*) (quoting Rahl, "Price Competition and the Price Fixing Rule—Preface and Perspective", 57 *Nw.U.L.Rev.* 137, 142 (1962)) (footnote omitted). It is clear that maximum resale price maintenance remains *per se* illegal.[3]

### III.

We also look to the legislative history of the antitrust laws for guidance. Professor Eleanor Fox has summarized the findings of historians as follows:

> As history teaches, "efficiency" is not the reason for antitrust. Indeed, those who valued efficiency more than competition opposed antitrust bills on grounds that they would constrain some activity that might save costs for a producer and forbid some activity that does not interfere with optimal allocation of resources. Rather than standing for efficiency, the American antitrust laws stand against private power. Distrust of power is the one central and common ground that over time has unified support for antitrust statutes. Interest of consumers have been a recurrent concern because consumers have been perceived as victims of the abuse of too much power. Interests of entrepreneurs and small business have been a recurrent concern because independent entrepreneurs have been seen as the heart and lifeblood of American free enterprise, and freedom of economic activity and opportunity has been thought central to the preservation of the American free enterprise system.

> One overarching idea has unified these three concerns (distrust of power, concern for consumers, and commitment to opportunity of entrepreneurs): competition as process. The competition process is the preferred governor of markets. If the impersonal forces of competition, rather than public or private power, determine market behavior and outcomes, power is by definition dispersed, opportunities and incentives for firms without market power are increased, and the results are acceptable and fair.

Fox, "The Modernization of Antitrust: A New Equilibrium", 66 *Cornell L.Rev.* 1140, 1152–54 (1981) (footnotes omitted); *see* R. Hofstadter, "What Happened to the Antitrust Movement?", in *The Paranoid Style in American Politics and Other Essays* 188, 199–200 (1965).

Price-fixing of any kind distorts in a basic way the competitive process the antitrust laws were meant to protect. Two prominent commentators have described vertical price fixing as follows:

---

**3.** Recently, in *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Solicitor General and a number of other *amici* asked the Supreme Court to reconsider the inclusion of resale price maintenance within the *per se* rule. The Court declined to do so. *Id.* at 761–62 n. 7, 104 S.Ct. at 1469–70 n. 7; *see Business Elecs. Corp. v. Sharp Elecs. Corp.*, —— U.S. ——, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988) (reaffirming the *per se* illegality of vertical price agreements).

Although the dissent disclaims taking any position on whether maximum vertical price fixing should any longer be *per se* illegal, dissent at 9 n. 5, it is almost impossible to read the opinion's lengthy discourse on the benefits of this practice as saying anything else. It claims that ARCO's competitors are not harmed by its conduct, and that its consumers will only benefit. Yet, as discussed in Part III of this opinion, the Supreme Court has established *per se* rules against certain conduct only "for conduct that is manifestly anti-competitive, that is conduct that would always or almost always tend to restrict competition...." *Business Elecs. Corp.*, 108 S.Ct. at 1519 (internal quotes and citations omitted).

[S]uccessfully maintained vertical price fixing is often the expression of economic power based on market imperfections, imbalances in bargaining power, or the presence of some level of oligopoly-like power due to trademarks or product differentiation. As such, vertical price fixing directly interferes with the freedom and opportunity of retail competitors to compete on the merits and usually results in higher prices to consumers. It enables the proponent of a restraint to assert an absolute property right and to suppress distributor competition on price, denying the right of independent distributors to succeed or fail on the competitive merits.

Flynn & Ponsoldt, "Legal Reasoning and the Jurisprudence of Vertical Restraints: The Limitations of Neoclassical Economic Analysis in the Resolution of Antitrust Disputes", 62 *N.Y.U.L.Rev.* 1125, 1148 (1987).

The Supreme Court cases echo the historians' conclusions regarding the objectives of the antitrust laws. The Court states that the rules against price fixing have a number of objectives, including the protection of the competitive process. Congress intended that market forces alone determine what goods and services are offered, at what price these goods and services are sold, and whether particular sellers succeed or fail. *See, e.g., Socony*, 310 U.S. at 221, 223, 225–26 n. 59, 60 S.Ct. at 843, 844, 846 n. 59; *Kiefer–Stewart*, 340 U.S. at 213, 71 S.Ct. at 260–61 (price fixing conspiracies "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment"); *Albrecht*, 390 U.S. at 152–53, 88 S.Ct. at 873 (price fixing conspiracies "severely intrude upon the ability of buyers to compete and survive in [the] market"); *Maricopa County*,

457 U.S. at 348, 102 S.Ct. at 2475 ("The *per se* rule 'is grounded on faith in price competition as a market force [and not] on a policy of low selling prices at the price of eliminating competition.' ") (quoting Rahl, "Price Competition and the Price Fixing Rule—Preface and Perspective", 57 *Nw.U. L.Rev.* 137, 142 (1962)). When sellers conspire to fix prices, the market mechanism is distorted: prices may be driven higher,[4] some goods and services may not be offered, and sellers may succeed or fail for reasons other than their ability to respond to the demands of the market. Rules against price-fixing are thus meant to prevent harm to both consumers and to sellers.

■ The "antitrust injury" standard requires us to determine whether the plaintiff's injuries resulted from a disruption of competition in the plaintiff's market caused by the defendant's antitrust violation. *See generally* Note, "Antitrust Standing, Antitrust Injury, and the Per Se Standard", 93 *Yale L.J.* 1309 (1984). In the present case the inquiry seems straightforward: USA's claimed injuries were the direct result, and, indeed, under the allegations we accept as true, the intended objective, of ARCO's price-fixing scheme. According to USA, the purpose of ARCO's price-fixing is to disrupt the market of retail gasoline sales, and that disruption is the source of USA's injuries.

ARCO argues that USA, as ARCO's competitor, cannot claim an antitrust injury, because injury to competitors is not the type of injury that the rule against maximum resale price maintenance was meant to prevent—at least in cases where predatory pricing is not alleged.[5] ARCO's argument misconceives the Supreme Court's analysis. The Supreme Court has not dis-

**4.** The dissent's contention that maximum vertical price fixing is "less destructive than minimum price fixing because it generally results in lower prices to consumers," Dissent at 700–701, is questionable at best, but in any event simply irrelevant. Both violations are classified as *per se* because the resulting harm to competition is extremely serious. Moreover, the Ninth Circuit case the dissent cites for its proposition, *Northwest Publications Inc. v. Crumb*, 752 F.2d 473, 475 (9th Cir.1985), simply does not say what the dissent says it does. Although we did note that

these restraints "*arguably* benefit consumers," *id.* (emphasis added), we also enumerated some of the reasons, as we do above, why the Supreme Court still holds that "maximum price-fixing is as pernicious as minimum price-fixing." *Id.* We discuss below our views of the other case the dissent cites, *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698 (7th Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).

**5.** In essence, this is also the position the dissent takes. "Maximum vertical price fixing is destructive when the prices set are predatory."

cussed maximum resale price maintenance as a separate type of antitrust violation, but only as one form of price fixing. *See Arizona v. Maricopa County Medical Society*, 457 U.S. at 348, 102 S.Ct. at 2475; *Albrecht v. Herald Co.*, 390 U.S. at 152–53, 88 S.Ct. at 873. Thus, the proper question is not what type of injuries a rule against maximum resale price maintenance was meant to prevent, but what kind of injuries rules against price fixing were meant to prevent. The Supreme Court has indicated that the *per se* rule against price-fixing is aimed at the long-term as well as the short-term effects such practices have in the market, and not merely the immediate consequences for prices. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, —— U.S. ——, 108 S.Ct. 1515, 1519–20, 99 L.Ed.2d 808 (1988) (characterizing interbrand competition as the primary concern of antitrust law, and listing "the creation and maintenance of small businesses" as one of its objectives). The removal of some elements of price competition distorts the markets, and harms all the participants: those retailers which have lost their ability to set prices, the other retailers in the same market who are harmed by the distorted market, and the consumers. Even if we were to analyze the question at the more specific level of maximum resale price fixing, given the long-term consequences of that practice we would reach the same result for similar reasons.

■ ARCO relies in part on *Cargill, Inc. v. Montfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). That reliance is misplaced. In *Cargill*, plaintiff, a large beef-packing firm, sought injunctive relief to enjoin the merger of the second and third largest beef-packing firms in the industry. The plaintiff asserted that the defendant would be able to lower its prices due to "multiplant efficiencies". *Id.* 107 S.Ct. at 491. This would require plaintiff in turn to lower its prices, thus lowering its profits. *Id.* at 492. The Supreme Court held that this injury did not constitute "antitrust injury"; the Court relied in part on the fact that plaintiff had not shown that the defendant had engaged or would engage in unlawful or predatory pricing. *Id.* at 492–94. In other words, in *Cargill* the plaintiff failed to show that the pricing practices that it claimed was causing or would cause its injuries were illegal.[6] In fact, the Court termed the defendant's pricing policies "vigorous competition" and said that the antitrust laws protect small businesses "only against the loss of profits from practices forbidden by [those] laws." *Id.* at 492. In the present case, plaintiff's injuries result directly from pricing practices that defendants admit (for the purpose of this appeal) are forbidden by the antitrust laws and are therefore illegal.[7]

In *Cargill*, as in *Brunswick*, the connection between the antitrust violation and the activity which caused the alleged injury is

Dissent at 701 (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 584, 106 S.Ct. 1348, 1354–55. However, the *Court* in *Matsushita* did not comment on whether maximum vertical price maintenance is destructive in the absence of predatory pricing. That issue was simply not before the Court or considered by it.

The dissent's position would preclude a finding of a violation of the antitrust laws in the case of the vast majority of unlawful maximum resale price agreements—i.e., those not accompanied by predatory conduct. No one, except an unenthusiastic Department of Justice and, under certain circumstances, the dealers who are parties to the resale price maintenance agreement, would have standing to bring suit to challenge conduct which undeniably is forbidden by the antitrust laws. This would virtually amount to a finding that *Brunswick* has, *sub silentio*, overruled *Albrecht, Kiefer–Stewart,* and *Maricopa County*, P. Areeda & H. Hovencamp,

*Antitrust Law* ¶ 335.2(i), at 277 n. 56 (1987 Supplement).

6. For a single firm's pricing practices to violate the antitrust laws, that firm must be engaged in predatory pricing or discriminatory pricing (the Robinson Patman Act, 15 U.S.C. § 13(a)). However, much less need be shown to assert that the pricing practices of two or more firms have violated the antitrust laws: it need only be shown that those firms have conspired to fix prices. *See generally* H. Hovenkamp, *Economics and Federal Antitrust Law* 92–124, 159–61, 172–73, 258–65 (1985). Here, a price-fixing agreement between ARCO and its dealers is alleged.

7. There is another reason why *Cargill* is not dispositive. The law against monopoly involved in *Cargill*, section 7 of the Clayton Act, attempts to prevent market structures in which the competitive process is vulnerable to distortion. The

attenuated or indirect. In those cases, the violation was a merger or an acquisition, and the injury occurred because of pricing practices which were themselves legal.[8] As the Court held, injuries derived from legal pricing practices are not necessarily the type of injuries rules against certain types of mergers and acquisitions were meant to prevent. *See Cargill,* 107 S.Ct. at 492–93; *Brunswick,* 429 U.S. at 486–88, 97 S.Ct. at 696–97.

## IV.

ARCO claims that USA does not have standing under the "antitrust injury" standard because maximum resale price mainte-

nance increases rather than decreases competition.[9] Maximum resale price maintenance brings prices lower, not higher. If competitors fail, it is because they are not able to match the low prices charged by the maximum resale price maintenance retailers. This is a typical cost of competition, according to ARCO, and not a problem for antitrust policy. ARCO relies heavily on the argument that the antitrust laws were enacted for "the protection of *competition, not competitors." Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). However, we have earlier discussed the problems with misreading that aphorism:

distortion is only potential. In price-fixing cases, by contrast, the distortion of the price-fixing cases, by contrast, the distortion of the price mechanism has, by definition, already occurred.

**8.** This characterization applies equally well to *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont De Nemours & Co.,* 826 F.2d 1235 (3rd Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). In *Alberta Gas,* plaintiff claimed that defendant's acquisition of a company caused the acquired company to cancel a project. Because the project was canceled, the acquired company bought less of plaintiff's product. The court found that the plaintiff had not shown antitrust injury. This, too, is an unsurprising finding: the connection between violation and injury is too attenuated for the plaintiff to claim, without more, that the injury involved is of the type the particular antitrust rule was meant to prevent.

**9.** ARCO relies on *Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256 (9th Cir.1981), heavily, and the dissent does so equivocally, recognizing that the case is not controlling. In fact, *Murphy Tugboat* is wholly inapplicable. In *Murphy Tugboat,* one tugboat company complained of the low fees charged by another tugboat company for the services of its licensed inland pilots. These lower fees were the result of a labor agreement entered into between the inland pilots and one of the defendants. Because the plaintiff was not a competitor in the area covered by the labor agreement, the legality of that agreement was irrelevant to our principal inquiry. In any event, we ultimately held that the agreement was valid. *Id.* at 1259. As a result, the plaintiff's claim depended entirely on whether the defendants' "overall pricing policies constitute[d] anticompetitive conduct." *Id.* at 1259. With the labor agreement, and thus the price-fixing allegation removed from the case, an antitrust violation could only be demonstrated by proof of a predatory pricing scheme. This is in stark contrast to the present case, in which the defendant's unlawful price-fixing is (for the pur-

pose of the summary judgment motion) conceded and thus an antitrust violation is established without any need to show predatory pricing.

As the dissent points out, we did state in *Murphy Tugboat* that "[the antitrust laws] do not prohibit non-predatory conduct that results in a lower price to the consumer." Dissent at 702. However, the dissent ignores the crucial fact that, in *Murphy Tugboat,* predatory pricing was a necessary element because, in the absence of such conduct, there was no *violation* of the antitrust laws. (It also fails to mention that *Murphy Tugboat* was not a maximum resale price case and did not purport to discuss the role of predatory conduct in such cases.) It was in connection with our discussion of whether a *violation* had occurred that we made the statement that the dissent now lifts wholly out of context—the statement that the antitrust laws do not protect inefficient businessmen against others who establish lower prices but do not engage in predatory conduct. Here, however, we are not seeking to determine whether a *violation* of the antitrust laws occurred. For our purposes, there is a *conceded violation* of those laws; specifically, it is agreed that a violation occurred in the absence of predatory pricing. The only question here is whether there is a cognizable injury.

In short, *Murphy Tugboat* deals solely with the issue of when a plaintiff who is not the defendant's competitor in the area in question may claim that an antitrust violation has occurred. The question of when a plaintiff who *is* a competitor can prove "antitrust injury" is the basic issue in the present case. Indeed, it is worth noting that the Seventh Circuit did not consider *Murphy Tugboat* sufficiently on point to mention it when it considered the same question now before this court—whether competitors have antitrust injury *standing* in maximum resale price cases. *Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698 (7th Cir. 1984).

The purpose of drawing a distinction between harm to competition and harm to competitors is to point out that not all acts that harm competitors harm competition. However, the converse is *not* true. Injury to competition necessarily entails injury to at least some competitors. Competition does not exist in a vacuum; it consists of rivalry among competitors. Clearly, injury to competitors may be probative of harm to competition, although the weight to be attached to such evidence depends on its nature and on the nature of the challenged conduct. The aphorism may not be invoked blindly in response to a showing that competitors have been harmed; otherwise it would often serve to shield unlawful conduct that adversely affects competition.

*Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir.1988).[10]

■ We reject ARCO's characterization that USA's injury resulted from *"increased,* not reduced ... competition," as contrary to the antitrust laws. As in the terms of the Robinson–Patman Act, 15 U.S.C. § 13(a), the success of some firms and the failure of other firms, when due to illegal pricing practices, must be characterized as a "lessen[ing] [of] competition", not an increase in competition. Also, when firms conspire to fix low prices in order to drive out competition, the long-term consequences may be higher prices and reduced service to consumers. *Cf. Albrecht,* 390 U.S. at 152–53, 88 S.Ct. at 873: *Socony–Vacuum,* 310 U.S. at 221, 71 S.Ct. at 268–69.

We note that commentators with a particular economic viewpoint have argued that maximum resale price maintenance should not be a *per se* violation of the antitrust laws.[11] However, we cannot ignore the fact that maximum resale price maintenance is *per se* illegal, simply because some might think that rule is unwise or because of commentators' speculation that the rule's demise might be in sight. *See Northwest Publications, Inc. v. Crumb,* 752 F.2d 473, 475 (9th Cir.1985); *cf. Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698, 707, 709 (7th Cir.1984). The Supreme Court has clearly stated—and restated—that maximum resale price maintenance, as a form of price fixing, is *per se* illegal, and that rule binds us until the Court or Congress [12] clearly states otherwise. USA alleges that ARCO's price-fixing had the objective of forcing independent gasoline retailers from the market, and that ARCO had been largely successful in that objective. In its complaint, USA states that "more than a dozen large independents have sold out, liquidated or drastically curtailed their operations, and many independent retail stations have been closed." It also states that the barriers to entry into the retail gasoline market have been heightened so that "once an independent is eliminated, it is highly unlikely that it will be replaced." The objective and effect of ARCO's illegal pricing scheme has been to reduce the number of independent gasoline retailers, in other words, to reduce competition. USA complains that it has suffered financial losses and is being driven out of the market by ARCO's illegal price-fixing. This is the type of injury that the antitrust rules were meant to prevent.

■ Finally, we consider the Seventh Circuit's treatment of the issue. In *Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698 (7th Cir.1984), Wal-

---

**10.** *See* Flynn & Ponsoldt, *supra,* at 1126 n. 4 (citation omitted):

> One of the more popular cliches is that the antitrust laws protect competition, not competitors. The cliche implicitly asserts that one can have competition without competitors, contains no definition of "competition," and is frequently used to deny the congressionally defined goals of antitrust policy in favor of the narrow goals assumed by the neoclassical model.

**11.** *See, e.g.,* Blair & Fesmire, "Maximum Price Fixing and the Goals of Antitrust", 37 *Syracuse L.Rev.* 43 (1986); H. Hovenkamp, *Economics and Federal Antitrust Law* 247–72 (1985); Easterbrook, "Maximum Price Fixing", 48 *U.Chi.L. Rev.* 886 (1981); R. Bork, *The Antitrust Paradox* 280–98 (1978).

**12.** *See Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 769, 104 S.Ct. 1464, 1473, 79 L.Ed. 2d 775 (1984) (Brennan, J., concurring).

ters, a building-materials dealer, was a distributor of goods produced by Morton, a manufacturer of prefabricated farm buildings. Walters claimed, among other things, that Morton had coerced its dealers, including Walters, to maintain a conspiracy to maintain maximum resale prices. *Id.* at 706. The district court dismissed Walters' claims, and the Seventh Circuit affirmed. Regarding the maximum resale price maintenance, Judge Posner, writing for the court, concluded that Walters had not shown antitrust injury:

> In the present case, even if Morton did violate the prohibition against fixing its dealers' prices, the only harm to Walters came from the fact that competing dealers (or Morton itself) would lower their prices to consumers if Walters did not. There is no suggestion that the lower prices would have been below cost; they would have been lawful prices.... Walters will not be heard to complain about having to meet lawful price competition, which antitrust law seeks to encourage, merely because the competition may have been enabled by an antitrust injury.

*Id.* at 709.

We disagree.[13] The antitrust laws were, as we discussed earlier, intended to give entrepreneurs and independent distributors an "even playing field." The competitive process can only rule when participants in the process are not allowed to combine to fix prices ahead of time.[14] We conclude that the purposes and policies of the antitrust laws are best effectuated by recognizing the "standing" of competitors to enforce the antitrust laws against price-fixing conspiracies. To put the same point differently, we conclude that the injury done to the market and to competitors by price-fixing conspiracies is antitrust injury—the type of injury the antitrust laws were meant to prevent.[15]

For the reasons stated above, we reverse the decision of the district court and remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

ALARCON, Circuit Judge, dissenting:

I.

In this antitrust action, plaintiff/appellant USA Petroleum Company ("USA") appeals from the district court's order granting summary judgment in favor of defendant/appellee Atlantic Richfield Company ("ARCO") for USA's failure to demon-

**13.** As one commentator has noted:
> Even consumers would not be able to bring actions under the rule established in Judge Posner's opinion in *Jack Walters & Sons Corp. v. Morton Building....*
> ... I cannot escape the conclusion that Judge Posner—growing impatient with Congress's or the Supreme Court's refusal to overrule *Albrecht*—has decided to undertake that task on his own.
> Members of the Chicago School have visions, as do most of us, of the kinds of things that should obtain in a perfect world. The per se rule against resale price maintenance is definitely not among them. That fact justifies arguments, both theoretical and political. But it does not justify taking the matter into one's own hands, no matter how certain we may be that we are right.

Hovenkamp, "Chicago and Its Alternatives", 1986 *Duke L.J.* 1014, 1025–26 (footnote omitted).

**14.** *Cf.* Flynn & Ponsoldt, *supra,* at 1149:
> [A conspiracy to fix prices] is a direct displacement of the competitive process of price determination. It is an assumption of power by the proponent of the restraint, denying

rights of distributors and consumers to make their own judgments about pricing—a denial of rights guaranteed by the goals of antitrust policy. Congress did not leave to the proponents of such restraints the authority to determine unilaterally the scope of the contract rights of distributors. Similarly, Congress did not intend the proponents of maximum price fixing to determine what the best price should be for the benefit of the public.

**15.** We recognize that our decision conflicts with that of the Seventh Circuit. In *U.S. v. Larm,* 824 F.2d 780, 784 (9th Cir.1987), we said "absent some good reason to do so, we are disinclined to create a direct conflict with another circuit." We did not intend by that statement to surrender our authority to decide important issues of first impression or to suggest that we would adopt the view of the first circuit to consider such issues in every instance. Rather, we meant that we would give respectful attention to the views of the other circuit and carefully evaluate that circuit's analysis before settling on ours. Here we have done so and we find good reason to disagree with the result reached by Judge Posner.

strate "antitrust injury." I respectfully disagree with the majority's conclusion that the district court erred. Because USA failed to present any facts showing antitrust injury, I would affirm.

## II.

USA, a gasoline retailer, brought this action to challenge ARCO's marketing program in which ARCO discontinued its credit cards and offered lower gasoline prices to consumers. USA claimed ARCO, a major integrated oil company, violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), by conspiring with certain retail dealers to set retail prices for ARCO-brand gasoline at levels USA could not match. USA claimed ARCO violated section 2 of the Sherman Act, 15 U.S.C. § 2 (1982), by attempting to monopolize the retail gasoline market through the "predatory pricing" of its ARCO-brand gasoline. USA also asserted claims for violations of the Robinson–Patman Act, the Cartwright Act and various state laws.

USA claimed ARCO's increased price competition resulted in it having "lost sales it otherwise would have made." USA sought compensation for these lost sales under section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), which provides, in part, "[a]ny person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained."

ARCO moved for summary judgment on USA's sections 1 and 2 claims. ARCO contended USA's section 2 claim failed for no "dangerous probability" existed that ARCO-brand sellers would monopolize the market. ARCO contended USA's section 1 claim failed for want of antitrust injury. ARCO contended the injury USA described in its complaint was not antitrust injury because it resulted solely from non-predatory price competition.

In response to this motion, USA voluntarily dismissed its section 2 claim. Thereafter, ARCO renewed its motion concerning USA's section 1 claim. The district court held that, even assuming a vertical conspiracy to fix maximum prices, USA

"cannot satisfy the 'antitrust injury' requirement of Clayton Act § 4, without showing ... [the prices charged for ARCO gasoline] to be predatory." The court found those prices were not predatory. Accordingly, it granted ARCO's motion and dismissed USA's complaint with prejudice.

## III.

USA claims the district court misapplied the substantive law when it concluded the injury USA suffered as a result of the alleged price-fixing conspiracy was not antitrust injury, i.e. "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). USA contends it suffered antitrust injury because its injury resulted from an illegal price-fixing conspiracy.

We review independently and non-deferentially a contention that the district court misapplied the substantive law in its order granting summary judgment. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986). We view the evidence in the light most favorable to USA, the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Baker v. Department of Navy,* 814 F.2d 1381, 1382 (9th Cir.) *cert. denied,* — U.S. —, 108 S.Ct. 450, 98 S.Ct. 390 (1987).

## IV.

The issue presented on this appeal is a difficult question of first impression. We are asked to determine whether a retail competitor suffers antitrust injury in the form of lost profits as a result of a non-predatory maximum vertical price fixing agreement. We must assume for purposes of this appeal that USA could prove a *per se* violation of Sherman Act § 1 for maximum vertical price fixing. However, as the Supreme Court in *Matsushita* instructs, "... [USA] must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them

resulting from the illegal conduct." 475 U.S. at 586, 106 S.Ct. at 1356.

The concept of antitrust injury had its origins in the Supreme Court's decision in *Brunswick*, 429 U.S. 477, 97 S.Ct. 690. In *Brunswick*, the plaintiff bowling alley operators brought a treble damage action under section 4 of the Clayton Act against a competing bowling alley operator. Plaintiffs claimed their competitor's acquisition of several bowling alleys in the proximity of their operation violated section 7 of the Clayton Act inasmuch as it threatened to "create a monopoly." *Id.* at 480, 97 S.Ct. at 693. To establish damages, the plaintiffs demonstrated that had the competitor not acquired the alleys, those alleys would have closed and plaintiffs' profits would have increased from the resultant reduction in competition.

The Supreme Court held that plaintiffs seeking treble damages under section 4

> must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 488–89, 97 S.Ct. at 697 (emphasis in original). Applying this principle, the Court held the plaintiffs' claim failed for their injury resulted solely from preservation of competition. An injury suffered on account of preservation of competition, according to the Court, is not one the "antitrust laws were intended to prevent." *Id.* at 488, 97 S.Ct. at 697.

## V.

Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982) provides in relevant part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." Price fixing agreements, whether they set minimum or maximum prices or whether they are horizontal or vertical agreements, are all deemed *per se* violations of Sherman Act § 1 despite the fact that some types of price fixing agreements may have competitive benefits. *See e.g.*, *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S.Ct. 720, 724, 93 L.Ed.2d 667 (1987) (minimum vertical price fixing); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (horizontal maximum price fixing); *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (maximum vertical price fixing); *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (vertical and horizontal maximum price fixing); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (horizontal minimum price fixing). The *per se* rule is based in part on "economic prediction, judicial convenience, and business certainty." 457 U.S. at 354, 102 S.Ct. at 2478. Thus, "[a]s in every rule of general application, the match between the presumed and the actual is imperfect." *Id.* at 344, 102 S.Ct. at 2473. *See also Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 n. 16, 97 S.Ct. 2549, 2557 n. 16 53 L.Ed.2d 568 (1977) ("cases that do not fit the generalization may arise"). Because the match between the conduct and the rule may be imperfect, it follows that some conduct which does not fit the reason for finding an antitrust violation may not result in antitrust injury or may result in only limited antitrust injury.[1]

The majority states that the proper question is not "what type of injuries a rule

---

1. USA asserts that the *per se* rule conclusively presumes that maximum vertical price fixing is anticompetitive so it can never have any procompetitive consequences. On the contrary, the *per se* rule is a recognition that although price fixing agreements may have some procompetitive potential, the anticompetitive effects on balance outweigh the procompetitive aspects. *See Continental T.V., Inc.*, 433 U.S. at 50 n. 16, 97 S.Ct. at 2557 n. 16. Antitrust injury analysis requires that the "injury" reflect the anticompetitive effect of the violation, not any procompetitive effects. *See Brunswick*, 429 U.S. at 488–89, 97 S.Ct. at 697. For examples of antitrust violations without antitrust injury, *see Local Beauty Supply, Inc. v. Lamaur, Inc.*, 787 F.2d 1197 (7th Cir.1986); Page, *The Scope of Liability for Antitrust Violations*, 37 Stan.L.Rev. 1445, 1469–70

against maximum resale price maintenance was meant to prevent, but what kind of injuries rules against price fixing were meant to prevent." Maj. op. at 694. This inquiry ignores the *Brunswick* requirement that the injury reflect the anticompetitive effect of the violation. The anticompetitive effects will be different depending on the type of price fixing agreement. Thus, the Supreme Court instructs us that:

> The term "restraint of trade" in [Sherman Act § 1], like the term at common law, refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances.

*Business Electronic Corp. v. Sharp Electronics Corp.,* — U.S. —, 108 S.Ct. 1515, 1523, 99 L.Ed.2d 808 (1988). Therefore, we must analyze "illegal price fixing agreements" to determine whether the agreement is horizontal or vertical *and* whether it sets maximum or minimum prices so we can properly determine the economic consequences and anticompetitive effects. This inquiry is necessary to determine whether an injury allegedly caused by "illegal price fixing" is of the type the antitrust laws were meant to prevent.

In general, horizontal price fixing agreements are illegal because they create market power that did not previously exist and this cooperative action among competitors creates a restraint that is otherwise not possible. 7 P. Areeda, *Antitrust Law,* ¶ 1437 (1986). In contrast, a vertical price restraint ordinarily does not increase anyone's market power but merely reflects existing power of one party in the marketplace. 7 P. Areeda, *Antitrust Law,* ¶ 1437 (1986). The impact of vertical price restrictions is to reduce or eliminate intrabrand competition[2] without necessarily impacting interbrand competition.[3] *See Continental T.V., Inc.,* 433 U.S. at 51–52, 97 S.Ct. at

2558 (1977); Shores, *Vertical Price–Fixing And The Contract Conundrum: Beyond Monsanto,* 54 Fordham L.Rev. 377, 379 (1985). In contrast, horizontal price restraints drastically reduce interbrand competition. *See White Motor Co. v. United States,* 372 U.S. 253, 267, 83 S.Ct. 696, 704, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring); *see also, Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 348 n. 18, 102 S.Ct. 2466, n. 18, 73 L.Ed.2d 48 (1982) ("horizontal restraints are generally less defensible than vertical restraints"); Shores, *supra.* at 401. A reduction in interbrand competition causes more concern under the antitrust law, because interbrand competition is seen as the primary concern of the antitrust law. *Continental T.V., Inc.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.

The effect of minimum price fixing, whether horizontal or vertical, is generally higher prices. Pitofsky, *In Defense of Discounters: The No–Frills Case for A Per Se Rule Against Vertical Price Fixing,* 71 Geo.L.J. 1487, 1488 (1983); *324 Liquors,* 475 U.S. 335, 107 S.Ct. at 723. In addition, minimum vertical price fixing, unlike some other types of vertical restraints, is similar to horizontal price fixing because it restricts interbrand competition. *Continental T.V., Inc.,* 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18 (*citing White Motor Co.,* 372 U.S. at 268, 83 S.Ct. at 704–05 (Brennan, J., concurring)).

Maximum price fixing, whether vertical or horizontal, is not viewed as being as destructive as minimum price fixing principally because it generally results in lower prices to consumers. *Northwest Publications, Inc. v. Crumb,* 752 F.2d 473, 475 (9th Cir.1985); *accord Jack Walters & Sons Corp. v. Morton Building, Inc.,* 737 F.2d 698, 708–09 (7th Cir.) *cert. denied,* 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359

---

(1985); 2 P. Areeda & D. Turner, *Antitrust Law,* ¶¶ 345 & 346.

**2.** Intrabrand competition involves competition among sellers of the same brand of the same product. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977).

**3.** Interbrand competition involves competition between sellers of different brands of the same generic product. *Continental T.V., Inc.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.

(1984). Maximum horizontal price fixing is viewed as more anticompetitive than maximum vertical price fixing because of its potential to eliminate interbrand competition.[4] Maximum vertical price fixing lacks the potential anticompetitive effects that maximum horizontal price fixing has, and in contrast has the potential for creating a competitive benefit. *See* Easterbrook, *supra*, at 890 n. 20.[5] Indeed, maximum vertical price fixing by a single manufacturer may stimulate interbrand competition.[6] *See 324 Liquor Corp.*, 479 U.S. 335, 107 S.Ct. at 724 ("a vertical restraint imposed by a *single* manufacturer or wholesaler may stimulate interbrand competition even as it reduces intrabrand competition") (emphasis in original). Maximum vertical price fixing is destructive when the prices set are predatory. *See Matsushita*, 475 U.S. at 584, 106 S.Ct. at 1354–55. Below cost prices are seen as predatory "chiefly in cases in which a single firm having a dominant share of the market, cuts its prices in order to force competition out of the mar-

ket, or perhaps to deter potential entrants from coming in." *Id.* at 584 n. 8, 106 S.Ct. at 1355 n. 8. Thus, USA's injury must be viewed in the context of the alleged antitrust violation to determine whether the alleged injury results from the *anticompetitive* aspects of the maximum vertical price fixing agreement.

## VI.

The antitrust injury analysis in a maximum vertical price fixing agreement is difficult because, as one commentator states, "[s]upplier regulation of the *maximum* prices charged by dealers is virtually never anticompetitive." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 335.2h, n. 56 (Supp. 1987); *see also* Page, *The Scope of Liability for Antitrust Violations*, 37 Stan.L. Rev. 1445, 1469–70 (1985) (when price fixing agreements reduce prices and increase output, no harm from the practice can be antitrust injury); Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U.Chi.L.

4. For a discussion of the potential anticompetitive effects of maximum horizontal price fixing, *see* Easterbrook, *Maximum Price Fixing*, 48 U.Chi.L.Rev. 886, 900–908 (1981). Despite the potential anticompetitive effects of maximum horizontal price fixing, Easterbrook argues that the *per se* rule should be abandoned in the maximum horizontal price fixing case. *Id.*

5. Because maximum vertical price fixing is viewed as having some procompetitive benefits and because its economic effect is not very different from nonprice vertical restraints, *Continental T.V., Inc.*, 433 U.S. at 69 & n. 10, 97 S.Ct. at 2567, n. 10, many commentators have argued that it should be analyzed under the rule of reason. Easterbrook, *supra* at 890 n. 20; Pitofsky, *supra*, at 1490 n. 17; *cf. Vertical Price Fixing*, 98 Harv.L.Rev. 983 (1985); *see also, The Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1153 n. 3 (9th Cir.1988) (presenting, "[a]n abbreviated bibliography of this debate"). I also note that the Supreme Court was asked by the Solicitor General and other *amici* in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), to reconsider whether vertical price restrictions should always be unlawful. The Supreme Court declined to reach the question because it had not been presented in the district court nor raised on appeal. 465 U.S. at 761 n. 7, 104 S.Ct. at n. 7. Similarly, this argument was not raised in the case before us, and I express no opinion as to the merits of this argument.

6. I note that the Supreme Court in dictum in *Business Electronic Corp.*, 108 S.Ct. at 1520 stated that "vertical price restraints reduce *interbrand* price competition." From the Court's citations it is clear that the Court was referring to *minimum* vertical price restraints. The Court cites *Continental T.V., Inc.*, 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18, which quotes Justice Brennan's concurring opinion in *White Motor Co. v. United States*, 372 U.S. 253, 268, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) where he stated, "[r]esale price maintenance is not only designed to, but almost invariably does in fact, reduce price competition not only *among* sellers of the affected product, but quite as much *between* that product and competing brands." Resale price maintenance has traditionally been used to refer to *minimum* vertical price fixing and was used by Justice Brennan in the context of a minimum vertical price fixing case. Similarly, the Court relies on Posner, *Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 Colum.L.Rev. 282, 294 (1975) in support of its comment. Again, Posner uses the term "resale price maintenance" to refer to minimum vertical price fixing. *See id.* at 292, n. 36. Furthermore, Posner uses Justice White's quote to refer to the "rule of *Dr. Miles*" which was a minimum vertical price fixing case. *Id.* at 294. Posner criticizes the Court for not drawing a distinction between minimum and maximum vertical price fixing. *Id.* at 297.

Rev. 467, 490–492 (1980). If the conduct is not anticompetitive, it follows that no antitrust injury exists.

The most common scenario involving a maximum vertical price fixing agreement involves a suit by dealers or distributors against their suppliers. The "restraint of trade" involved in a maximum vertical price fixing agreement between a supplier and its dealers is the elimination or drastic reduction of competition in the intrabrand market. Whether a coerced dealer in fact suffers antitrust injury by such an agreement would depend on the particular circumstances. 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 346c (1978); *see e.g. Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 708–09 (7th Cir. 1984), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (maximum vertical price fixing agreement did not result in antitrust injury to dealer); *cf. Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976) *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977) (pre *Brunswick* case awarding terminated dealers lost profits).

A case like the one before us invoking an action by one competitor against its rival's supplier cannot be satisfactorily resolved by adopting the analysis of the dealer versus supplier cases. Although a plaintiff does not have to "prove an actual lessening of competition in order to recover, ... the case for relief will be strongest where competition has been diminished." *Brunswick*, 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14. Thus, the drastic reduction or elimination of competition in the intrabrand market suggests that antitrust injury is more likely to occur in the dealer-versus-supplier cases. Furthermore, the dealer-versus-supplier cases usually involve coercion and threats which impair a dealer's "freedom" to set prices.[7]

The closest case to the facts presented here is *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir.1981), *cert. denied*,

455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). In *Murphy Tugboat*, the plaintiff tugboat company sued a rival tugboat company for treble damages under section 4 of the Clayton Act. The plaintiff claimed that the rival tugboat company entered into a price fixing agreement with inland pilots which set the fees for the pilots' services at a level that was lower than the fees otherwise charged by pilots in the San Francisco area. *Id.* at 1258. The plaintiff tugboat company claimed the pilot fee agreement was anticompetitive because the rival's package price, which included the tugs and the pilot fees, was lower than it would have been absent the agreement. If the rival's package price was lower, the plaintiff would have been able to charge a higher price or maintain price and increase market share. *Id.* at 1257–58. The plaintiff claimed these lost profits as damages.

We stated in *Murphy Tugboat* that the plaintiff did not and could not complain about the pilot fee agreement because the plaintiff was not operating in the pilot services market. We held that the rival's package price did not violate Sherman Act § 1 because the package price, which was always higher than the plaintiff's price, was not below cost. Therefore, the package price was not predatory and the rival did not violate Sherman Act § 1. In reaching this conclusion we stated, "[the antitrust laws] do not prohibit non-predatory conduct that results in a lower price to the consumer. The antitrust laws do not require the erection of a price umbrella for the benefit of inefficient competitors." *Id.* at 1259.

*Murphy Tugboat* is instructive, but it is not controlling because it differs from the present case in several important respects. First, the alleged price fixing in *Murphy Tugboat* did not exist in the plaintiff's tugboat market, it existed in the inland pilot market. Here, the alleged price fixing exists in USA's retail gasoline market. Sec-

---

**7.** Although USA alleged that it was "forced" to match ARCO's prices, it is difficult to see how ARCO with only 17% of the gasoline market during its most successful month "forced" USA to match ARCO's prices when most of the market had set prices above those required by ARCO. It would appear instead that USA voluntarily chose to match ARCO's reduced price to remain competitive.

ond, in *Murphy Tugboat* the package price charged to customers was not fixed. Only one component cost of the package price (the pilot fee) was fixed. In contrast, USA alleges that ARCO fixed the gasoline price charged to retail customers, not that ARCO fixed some component cost of supplying gasoline.

My research has not disclosed a case in this circuit or in any other jurisdiction dealing with a competitor versus its rival's supplier which addresses the antitrust injury requirement of Clayton Act § 4 in the context of a maximum vertical price fixing agreement in violation of Sherman Act § 1.[8] Instead, I have found repeated affirmations of the principle that the Sherman Act was designed by Congress as a "consumer welfare prescription," *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979), and was not designed to insulate competitors from vigorous competition. *See Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 *quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) ("the antitrust laws ... were enacted for 'the protection of *competition* not *competitors*'") (emphasis in original); *accord Triple M Roofing Corp. v. Tremco., Inc.*, 753 F.2d 242, 243 (2d Cir.1985) ("[t]he antitrust laws were never intended to provide a balm for the hardships occasioned by

vigorous competition"); *Matsushita*, 475 U.S. at 594, 106 S.Ct. at 1360 ("cutting prices in order to increase business often is the very essence of competition"); *cf. Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 495, 93 L.Ed.2d 427 (1986) ("a plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury, and that a showing of loss or damage due merely to increased competition does not constitute such injury").

## VII.

Turning to the facts before us, USA has alleged that ARCO conspired with its dealers to engage in maximum vertical price fixing to set prices below the market level.[9] The district court found ARCO's prices were not predatory,[10] and USA does not challenge this finding on appeal.

The impact of ARCO's alleged maximum vertical price fixing scheme would be to reduce or eliminate intrabrand competition among ARCO brand dealers without necessarily impacting interbrand competition.[11] Arguably, interbrand competition in the "discount gasoline" submarket[12] would be stimulated by ARCO's entry into the independent retailers' market niche. At the same time those gasoline dealers in the interbrand market who already were sell-

**8.** *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147 (10th Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed. 320 (1982) contains facts similar to the facts presented here. However, I do not find *King & King Enterprises* helpful because it did not discuss the antitrust injury requirement and it involved a horizontal conspiracy to fix maximum prices.

**9.** USA has not alleged and no facts exist in the record to suggest that any maximum horizontal price fixing agreement was also in existence. Vertical price fixing agreements which also have a horizontal element cause concern because not only do they reduce or eliminate intrabrand competition, but they have the potential to eliminate or drastically reduce interbrand competition. *See Keifer–Steward Co. v. Seagram & Sons*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

**10.** For a claim of a conspiracy to engage in *predatory pricing* the Supreme Court has stated

that a plaintiff does not suffer "antitrust injury unless petitioners conspired to drive [plaintiff] out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." *Matsushita*, 475 U.S. at 585 n. 8, 106 S.Ct. at 1355 n. 8. USA acknowledges that this standard is inapplicable to a conspiracy to engage in maximum vertical price fixing.

**11.** *See* Allison, *An Analysis of the Vertical Price–Nonprice Dichotomy*, 21 Akron L.Rev. 131 (1987). Allison conducted a study of price and non-price vertical restraints. In ten out of the eleven cases he studied involving maximum vertical price fixing and no other restraints, only intrabrand competition was affected. *Id.* at 166, table 1.

**12.** USA argued below that the discount gasoline submarket was a market separate from the retail gasoline market. The district court's findings established that no separate discount gasoline market existed.

ing at prices higher than USA and ARCO may not have been affected by ARCO's alleged price fixing agreement. In any event, the essence of USA's claim is that one of the major oil companies, ARCO, intruded upon the independent retailers' market niche by under pricing the independent retailers. The result is lower prices to consumers, but less profit for USA. USA's loss of profits from ARCO's vigorous competition is not antitrust injury.[13] The district court did not err in granting summary judgment in ARCO's favor on the basis of USA's failure to demonstrate antitrust injury.

USA attempts to avoid this result by reformulating the *Brunswick* test. USA misstates that test as inquiring whether ARCO's alleged *anticompetitive acts* were of the type the antitrust laws were intended to prevent as opposed to whether its *injury* was of the type the antitrust laws were intended to prevent. After reformulating the test, USA devotes the bulk of its efforts to demonstrate ARCO's alleged price-fixing activities were of the type the antitrust laws were intended to prevent. Having established this to its satisfaction, USA contends "[a]ll that remains ... is that USA show that its claimed damages flow from the presumed market distorting effects." Since, according to USA, the question of "flow" is "necessarily a fact intensive inquiry," USA concludes that this court must remand this issue for jury determination.

USA's reformulation of the *Brunswick* test transforms it into a simple question of causation. This mistaken notion directly contravenes *Brunswick*. The *Brunswick* court held plaintiffs seeking treble damages "must prove *more* than injury causally linked to an illegal presence in the market." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697 (emphasis added). As one commentator has persuasively stated using an example similar to the facts presented here,

Even if causation is assumed, we must ask whether the plaintiff is entitled to be free of a rival product's lowered price that is entirely lawful apart from the assumed vertical agreement.... [T]he plaintiff would rely on the assumed causation, but query whether protecting the plaintiff's interest in higher prices serves the purposes of the antitrust laws.... So long as the price of the defendant's product is itself lawful, the only reason for awarding the competitor treble damages is to encourage him to sue, but we have already seen that rationale to be insufficient. And the protection of the defendant's rivals is not the reason for prohibiting maximum resale maintenance. Those more directly affected are fully capable of suing, if they feel themselves detrimentally affected. And if they do not, perhaps the social interest in forbidding the practice is weak to begin with.

(Footnote omitted) 2 P. Areeda, *Antitrust Law* ¶ 346c (1978).

Under the majority's analysis price fixing "distorts the markets, and harms all the participants." Maj. op. at 694. Thus, the majority implies that retail dealers, retail competitors and consumers all suffer antitrust injury as a result of any illegal price fixing agreement. The majority's conclusion ignores the fact that consumers are not injured by maximum vertical price fixing, and retail competitors are not injured and cannot complain about minimum vertical price fixing. *Matsushita*, 475 U.S. at 582–83, 584 n. 8, 106 S.Ct. at 1354, 1355 n. 8. Market participants may all be harmed by different types of price fixing agreements, but they can only bring an action based on the type of agreement that injures them. The majority's refusal to analyze this case in the context of a maximum vertical price fixing agreement,[14]

---

**13.** According to the majority, as a result of price fixing, retail competitors are "harmed by the distorted market." Maj. op. at 694. However, the majority does not explain what the harm is or what the market distortion is.

**14.** The majority does state that, "[e]ven if [they] were to analyze the question at the more specific level of maximum resale price fixing, given the long term consequences of that practice [they] would reach the same result for similar reasons." Maj. op. at 694. However, the long term consequences the majority notes are high-

by relying instead on a generic illegal price fixing analysis, has resulted in a dissertation which is premised on "market distortions" that are never fully defined or explained.

I would affirm the district court's order granting summary judgment because USA failed to demonstrate antitrust injury.

er prices and reduced services to consumers. Maj. op. at 696. USA as a competitor would not suffer antitrust injury from either of these speculative long term consequences.