**H. E. FLETCHER CO., Plaintiff-Appellee,**

v.

**ROCK OF AGES CORPORATION,**
**Defendant-Appellant.**

**No. 207, Docket 28467.**

United States Court of Appeals Second Circuit.

Argued Dec. 4, 1963.

Decided Dec. 23, 1963.

Warren F. Farr, Boston, Mass., F. Elliott Barber, Jr., Brattleboro, Vt. (Frederick M. Reed, Barre, Vt., Truman S. Casner, Ropes & Gray, Boston, Mass., of counsel), for appellant.

Harold M. Willcox, Boston, Mass., Robert W. Larrow, Burlington, Vt. (Robert E. Sullivan; Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., of counsel), for appellee.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

Rock of Ages Corporation owns the sole quarry for Bethel White granite. It fabricates this and other stone for monuments and also for the building trade. H. E. Fletcher Co., a competing fabricator, relying on § 2 of the Sherman Act, 15 U.S.C. § 2, obtained from the District Court for Vermont an order enjoining Rock of Ages from refusing to sell it rough quarried Bethel White

granite, on "reasonable and normal commercial terms," in sufficient quantity to supply the amount specified by the General Services Administration (GSA) for a proposed west wing of the Museum of Natural History of the Smithsonian Institution. We reverse the injunction as improvidently issued.

The history of the controversy is as follows: The Museum of Natural History of the Smithsonian Institution, constructed in 1905, has a first story faced with "Milford Pink" granite, surmounted by a shaft of "Bethel White" granite supplied by a predecessor of Rock of Ages, and an attic story of Mt. Airy granite. Proposals by the GSA for bids for an east wing, to be submitted December 6, 1960, specified granites matching those in the original structure. More particularly, the specifications demanded that "Granite indicated on the drawings as type 'B' shall be 'Bethel White' as quarried by the Barre Building Granite, Inc., Barre, Vermont," a subsidiary of Rock of Ages;[1] the specifications went on to say that "The naming of granites is for the purpose of indicating the type that is required, but is not intended to exclude any granite having the characteristics which in the opinion of the Service, are so nearly like those named that they will give practically the same effect." Fletcher submitted proposals for furnishing the fabricated granites to various prime contractors. It intended to satisfy the specifications by supplying "New Hampshire Pink" instead of "Milford Pink," as it had once successfully done, and "Chelmsford White" in place of "Bethel White" and "Mt. Airy." The successful bidder for the prime contract accepted Fletcher's proposal, but the GSA rejected the equivalents offered, as well as another set submitted later. Fletcher then amended its contract to provide that it would furnish "Milford Pink," "Mt. Airy," and "Bethel White" or an "approved equal" in lieu thereof; it did this without any arrangement with Rock of Ages, from which it had never before procured Bethel White. When, in May, 1961, Fletcher requested Rock of Ages to furnish a quotation on some 11,000 cubic feet of Bethel White in rough mill blocks, Rock of Ages refused. It did this pursuant to an "evolving policy," which matured a year later, of selling Bethel White only in fabricated form. This policy stemmed both from alleged bad experience in the fabrication of Bethel White by others and from a desire by Rock of Ages to make the fabricating profit in a facility of its own, which, it asserts, was not working to capacity. Admittedly one of the reasons for the refusal to quote Fletcher in May, 1961, was that Rock of Ages had itself submitted to a stone contractor a bid to supply Bethel White for the Smithsonian east wing in fabricated form.

When Rock of Ages, living up to its name, remained adamant, Fletcher located in Plymouth, Vermont, a ledge of white granite which the GSA accepted as the equivalent of Bethel White. Fletcher filled its commitment for the east wing from this source, but only at what the record indicates to have been inordinate cost.

In April, 1962, the GSA requested bids for a west wing of the Museum. On this occasion the specifications, as amended, permitted the use for "Type B" of Bethel White or Plymouth White. Fletcher again called on Rock of Ages for a quotation of Bethel White in rough condition. This time Rock of Ages answered that while it would not sell rough blocks, it would sell fabricated stone to Fletcher at the same price as it would itself bid to any other contractor. Without asking for such a quotation, Fletcher submitted a bid for all the granites, on terms not disclosed by the record; the GSA rejected all general contractors' bids. In March, 1963, Fletcher, expecting that new invitations to bid for the west wing would shortly be issued, again asked Rock of Ages to quote "Bethel White," with the same result as in 1962.

Fletcher then began this action under the antitrust laws in the District Court

---

1. The subsidiary transferred all its business and property to the parent on December 31, 1960.

for Vermont; it sought, *inter alia,* treble damages for the excess costs incurred by it in filling its contract for the east wing with Plymouth White and an injunction against defendant's refusing to sell it rough quarried Bethel White at reasonable prices. Renewed invitations to bid for the west wing having been issued on May 24, 1963, Fletcher brought on for hearing its motion for a temporary injunction. By orders dated June 25 and 26, Judge Gibson granted the motion, conditioned on plaintiff's filing a $25,000 bond "for the payment of such costs and damages as may be incurred or suffered by the defendant if it is found that the defendant has been wrongfully enjoined." In an accompanying opinion he concluded "that the plaintiff may well succeed on the merits," and that "If the Court should deny the injunction, the plaintiff will have to bid under the pressure of considerable uncertainty" whereas "A granting of the preliminary injunction will enable the plaintiff to bid freely and accurately on the contract" and "The defendant will be protected from damage by a bond should it prevail on the merits." Defendant appealed to this Court, as permitted by 28 U.S.C. § 1292(a) (1). In October, 1963, a panel declined to suspend the injunction; we were advised at the argument in December that, in compliance with it, defendant has supplied plaintiff with the requisite amount of rough quarried Bethel White. We think the district court was in error on both of the grounds to which we have referred, and consequently find it unnecessary to consider other objections raised.

Recognizing that in order to obtain a temporary injunction in a private antitrust suit a plaintiff must show "that the danger of irreparable loss or damage is immediate," 15 U.S.C. § 26, the court overestimated both the plaintiff's plight in the absence of such an injunction and the alleviation that this could bring. The court's view might have been sustainable if Rock of Ages had refused, as it did in 1960, to quote Bethel White at all; for then Fletcher could have bid only on the basis of Plymouth White, the added cost of this might have been so prohibitive that it would not have dared to enter a truly competitive bid, and the damages for loss of the contract would be difficult or even impossible to ascertain.[2] See Judge L. Hand concurring in Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2 Cir. 1953). Rock of Ages' offer to supply fabricated Bethel White at the same price that it would bid to other contractors considerably altered this; Fletcher's risk then was simply the spread between what it would have considered a proper bid for furnishing Bethel White of its own fabrication and the price that Rock of Ages might have quoted. There is no way for us to tell exactly what this spread was;[3] after hearing the parties, the judge evidently thought the $25,000 which he fixed for the injunction bond was a fair figure. Whatever the spread, there is no showing why plaintiff could not have bid what it would have thought reasonable for Bethel White bought in rough form and fabricated by itself. If its bid was accepted, it could have purchased the fabricated granite from defendant, and, assuming that it correctly conceived its rights under the Sherman Act, could have recovered three times the spread as damages. To be sure, this subjected the plaintiff to the hazards of litigation, although in a knowable and not frightening amount. But, apart from any other considerations, the temporary injunction did not remove that risk, since the bond, specifically required by the statute, 15 U.S.C. § 26, left Fletcher liable for damages if in the end it was determined that Rock of Ages was within

---

2. Also Fletcher's rights to the Plymouth quarry had been attacked by a suit by a third party in a Vermont court; at the time of the injunction a verdict had been directed in Fletcher's favor but this was still subject to appeal.

3. The record does show that Rock of Ages bid $259,488 to general contractors in 1962. Fletcher's treasurer testified he had thought $200,000 to $220,000 a reasonable figure in 1960.

its rights in refusing to offer rough mill blocks. If it be said that the injunction put a ceiling on the hazard at the $25,000 specified in the bond, see Russell v. Farley, 105 U.S. 433, 437–447, 26 L.Ed. 1060 (1881); Lawrence v. St. Louis-S. F. Ry., 278 U.S. 228, 233, 49 S.Ct. 106, 73 L.Ed. 282 (1929), there are several answers: The first is that the proof does not show that the amount of the hazard would have been greater than this in any event. A second is that if in fact the bond required of Fletcher would not enable Rock of Ages to recover its full damages, the judge would thereby have failed, to precisely the same extent, in his stated objective to protect the defendant "from damage by a bond should it prevail on the merits." A third is that plaintiff's risk was cushioned by a three-to-one hedge in its favor under its treble damage remedy, 15 U.S.C. § 15.

These considerations as to the lack of adequate showing of irreparable damage gain added force from our serious doubt whether Fletcher met its burden of convincing "with reasonable certainty" that it "must succeed at final hearing." Hall Signal Co. v. General Ry. Signal Co., 153 F. 907, 908 (2 Cir. 1907). It had to rely, not on § 1 of the Sherman Act, but on the harder test of § 2. Although that section condemns actual or attempted monopolization of "any part of the trade or commerce among the several States, or with foreign nations," it is settled that this means a market constituting "some appreciable part." United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); United States v. Griffith, 334 U.S. 100, 106–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Defendant's affidavits alleged and plaintiff's did not deny that several other types of granite were competitive with Bethel White, and that the GSA's specifications for Government buildings using white granite normally permit the use of any of several types. Compare United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The specifications here were narrower only because

the original building had used Bethel White. If we accept *arguendo* plaintiff's premise that the quarrying and the fabrication of granite are different businesses, we would still have difficulty in concluding that a decision by the owner of the source of a particular white granite to do its own fabricating violates § 2 of the Sherman Act, a crime as well as an actionable wrong—at least, when, as here, the decision has not been shown to have had adverse competitive impact save as to a single building, and even as to it the Government could avail itself, although at some aesthetic sacrifice, of the close substitutes normally specified as alternatives. We know of no reason or precedent for considering so small a market an "appreciable part." See Report of the Attorney General's National Committee to Study the Antitrust Laws, 44–48 (1955). Despite the conventional antitrust trappings with which the case has been draped, what we have here, so far as the papers show, is essentially a private squabble between two sets of energetic Yankee businessmen. Of the two cases relied upon by the district judge, United States v. Aluminum Co. of America, 148 F.2d 416 (2 Cir. 1945), and United States v. Klearflax Linen Looms, Inc., 63 F.Supp. 32 (D.Minn. 1945), the former does not require detailed distinction and the latter, assuming it to have been soundly decided, see Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625 fn. 49, 73 S. Ct. 872, 97 L.Ed. 1277 (1953), involved all business with the Government and not merely a single building.

Although we hold the temporary injunction was improvidently issued, we must now take account of the fact that under its compulsion defendant has already sold the rough Bethel White to plaintiff, and we assume that substantial expenses in transportation and perhaps in fabrication have already been incurred. The district court need not allow defendant to retake such granite if that would produce economic waste; it may limit defendant to recovery of damages on the injunction bond. Even as to

18

this it may postpone the assessment of damages until it determines, on full hearing, whether plaintiff is able to adduce evidence that will entitle it to final relief. Lawrence v. St. Louis-S. F. Ry., supra; Madison Shipping Corp. v. National Maritime Union, 204 F.Supp. 22, 23 (E.D.Pa.1962). If defendant's victory on this appeal is thus rather Pyrrhic, that is an inevitable, although regrettable, consequence of the delays inherent in the appellate process.

The order is reversed for further proceedings consistent with this opinion.