**TRIPLE M ROOFING CORP.,**
**Plaintiff-Appellant,**

v.

**TREMCO, INC., Defendant-Appellee.**

**No. 499, Docket 84–7694.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1984.

Decided Jan. 18, 1985.

James N. Blair, New York City (Mary Elizabeth Kilgannon, Rogers, Hoge & Hills, New York City, of counsel), for defendant-appellee.

John L. Hawkins, New York City, for plaintiff-appellant.

Before FEINBERG, Chief Judge, and KAUFMAN and ROSENN,* Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Triple M Roofing Corp. ("Triple M") appeals from a judgment of the United States District Court for the Eastern District of New York dismissing its action alleging violations of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2 (1982). Triple M claimed that Tremco, Inc. ("Tremco") had attempted to monopolize the sales of roofing materials for a roof restoration project of the Georgia Department of Agriculture (the "Department") by urging the Department to name Tremco products in the contract specifications. It was also alleged that Tremco conspired with Triple M's competitors, as well as with Department officials, to inflate the price of Tremco brand resaturant coatings. The district court concluded that Triple M had defined the relevant market too narrowly to support a Section 2 claim, and failed to allege facts concerning any arrangement Tremco might have had with Department officials that would constitute a Section 1 violation. We affirm.

The antitrust laws were never intended to provide a balm for the hardships occasioned by vigorous competition. Mindful of this precept, courts have invested tremendous time and energy in attempting to confine the necessarily vague and potentially expansive notions embodied in the language of the antitrust statutes. Today we examine several of these restraining influences—both substantive and procedural—and conclude that a dispute arising from an ordinary construction contract does not im-

---

* Honorable Max Rosenn, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

plicate the economic and judicial concerns contemplated by the Sherman and Clayton Acts.

We hold that the district court properly found Section 2 of the Sherman Act inapplicable to activities occurring solely in the context of a single transaction. We also conclude that Triple M lacked proper standing, and could not assert appropriate antitrust injuries to recover damages stemming from the alleged conspiracy between Tremco and Triple M's rivals. With respect to the alleged conspiracy between Tremco and officials from the Department, we conclude that although Triple M possessed adequate standing to recover damages, the record fails to establish that an unlawful arrangement existed.

Before discussing the relevant principles of antitrust law, we believe they will come into sharper focus if we briefly set forth the underlying facts and procedural history of this dispute.

## I. *Background*

### a.

Defective roofs are generally repaired by removing and replacing the entire roof. A less common method of restoration, accounting for less than 10% of the sales of roof repair products, is the application of various resaturant coatings. Tremco manufactures these materials. In 1980, Tremco's share of the national market for resaturant coating was 20%. Because the use of this coating pales by comparison to the conventional "remove and repair" method, Tremco's share of the entire roof repair market was a mere 1.8%.

In an effort to garner a larger share of the overall market, Tremco promoted its products through a subtle combination of education and salesmanship. Newsletters extolling the virtues of resaturant coatings in general, and Tremco products in particular, were mailed to owners and managers of commercial real estate throughout the United States. When a property was identified as requiring roof repairs, a Tremco representative would call on an authorized representative and offer to inspect the building in question. The goal of these visits, of course, was to convince owners to recoat—rather than replace—their roofs and, more importantly, to specify the use of Tremco products. To this end, Tremco representatives routinely supplied potential buyers with sample job specifications to be incorporated into the specifications that were ultimately employed in roofing jobs open to bids by contractors.

Most commonly, Tremco products were not purchased by property owners, but rather by roofing contractors hired by the owners. In cases where the contract between owner and contractor specified that only Tremco products could be used, Tremco charged rates by reference to its published price list. Where the contract permitted substitution of a competing resaturant product, however, Tremco often charged prices well below the published figures. Occasionally, these discounts amounted to as much as 40 percent of list price.

### b.

The Department owns and operates a complex of buildings in Atlanta known as the Farmers Market. The task of planning the restoration of the roofs of these buildings was assigned to J. Broome, a Department engineer. In assessing possible cost-cutting techniques, Broome contacted Tremco to discuss the possibility of resaturating and repairing the roofs rather than replacing them. Broome had earlier been made aware of the method of restoration through Tremco's promotional literature and through a series of telephone conversations with Robert Helman, one of Tremco's field representatives. At Broome's invitation, Helman examined the Department's buildings and offered advice regarding what materials could be used to restore the roofs. These recommendations included proposed material specifications that would require contractors to furnish Tremco products.

Satisfied that recoating represented the most economical course, and convinced that Tremco's products were best suited for the job, Broome prepared job specifications re-

quiring the successful bidder to use Tremco coatings. Prospective bidders were explicitly informed that no substitute product could be used without the prior consent of the Department. Moreover, no contractor was permitted to submit a bid based on the price of a substitute brand unless it first submitted extensive information to the Department regarding that proposed alternative.

After the roof restoration project was advertised in a trade publication, several contractors requested bid documents from the Department and price lists from Tremco. In June 1980, Triple M was awarded the job, having bid $399,850. The next lowest bid was $412,401. At a subsequent meeting with Helman, Triple M was informed that Tremco's price list was firm and that there would be no discount for the Farmers Market job.

Apparently believing that Tremco's prices were well above the level of comparable products (as well as substantially higher than Tremco's discount price), Triple M's bid for the project had been based on the pricing of Koppers, one of Tremco's rival brands. No effort had been made, however, by Triple M to comply with the substitution procedures outlined in the bid proposal forms. The company's officials later claimed that they had believed compliance would have been too cumbersome and difficult, but they had neither asked the Department to relax the substitution requirements nor communicated their view that the procedures were onerous.

Triple M subsequently presented its predicament to Jimmy Bridges, the Department's purchasing agent, and asked permission to use Koppers's products instead of Tremco's. Bridges responded by informing Triple M's officials that they should have sought substitution prior to the bid date, and denied the request. He stated that to allow a sudden change would be unfair to those contractors that had relied on the specifications.

In a final attempt to extricate his firm from a potential commercial debacle, Triple M's President, Richard Milanese, attempted to order Tremco products at a discount price from Wesley Arendt, Tremco's sales manager for the New York region. Arendt was initially inclined to agree to the discount sale because he believed Triple M would use the materials for a roof restoration project in New York that permitted lower priced competing resaturant coatings. Upon realizing that Triple M intended to ship the materials to Atlanta, however, he informed Milanese that Triple M could purchase Tremco products for use on the Farmers Market job only at the original list price. Triple M eventually performed its contract with the Department of Agriculture and paid Tremco its list price for the resaturant coating.

c.

In September 1981, Triple M commenced this action in the Eastern District of New York, alleging that Tremco had violated Section 2 of the Sherman Act by attempting to monopolize the market for roofing materials to be used in the Farmers Market work. The complaint further alleged two distinct price fixing schemes in violation of Section 1. First, it claimed that Tremco had conspired with representatives of the Department to "secure the adoption of ... proprietary specifications so that ... [Tremco] would be able to control the prices for roofing materials." Also alleged was a conspiracy between Tremco and "one or more roofing contractors to have the price quoted in bids submitted on the [Farmers Market] project correspond to ... [Tremco's] artificially inflated prices." Triple M alleged damages equal to the difference between the price it actually paid for Tremco's products and the discounted price that it claims would have prevailed absent the illegal conduct. It sought to collect three times that amount pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982).

After limited discovery, Tremco moved for summary judgment, see Fed.R.Civ.P. 56(c), and the parties stipulated, pursuant to Local Civil Rule 3(g) of the Eastern District of New York, that there existed no genuine issues of material fact. After

hearing argument on the motion, Judge Wexler granted summary judgment in favor of Tremco on all three claims and ordered the complaint dismissed. He found that the market Tremco was alleged to have monopolized was too narrow to support a Section 2 claim. The Section 1 claim alleging a conspiracy between Tremco and Triple M's competitors was dismissed for lack of standing. The other alleged conspiracy—that between Tremco and the Department—was found not to support a claim under Section 1, because Triple M did not allege that the Department had conspired with Tremco regarding the price of its products. This appeal followed.

## II. *Discussion*

*The Section 2 Claim*

■ On its face, Section 2 prohibits the monopolization, or attempted monopolization, of "any part of the trade or commerce among the several states." 15 U.S.C. § 2 (1982). It is well settled, however, that the "any part" language indicates merely that the statute's proscriptive ambit extends to commercial activity in any region or in any market that affects an "appreciable part" of interstate commerce. *See Standard Oil Co. v. United States,* 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911); *H.E. Fletcher Co. v. Rock of Ages Corp.,* 326 F.2d 13, 17 (2d Cir.1963). Triple M asserts that the relevant market Tremco attempted to monopolize was that consisting of roofing materials to be used in connection with the Farmers Market project. Very simply, we do not believe that this market was sufficiently "appreciable" to support a claim under the antitrust laws.

■ To hold otherwise would read the Sherman Act as prohibiting commercial activity that is completely routine and altogether benign. Agreements whereby a contractor is obliged to employ a particular branded product are commonplace, and it has not been suggested that they ought to be discouraged. In such cases, the manufacturer of the branded product enjoys "monopoly power" within the market defined by the individual contract. But unless a manufacturer's power within such a *de minimis* market is the product of power within a larger market (which fact has not been alleged in this case), we see nothing wrong with such a "monopolist" charging any price it wishes. The frustrations Triple M may have experienced upon realizing that it could not secure Tremco products at as low a price as it would have liked do not implicate the economic concerns that properly animate the Sherman Act's proscriptions.

In *Rock of Ages, supra,* a contractor obligated to furnish a unique type of granite from a particular quarry sought to enjoin the supplier from refusing to sell the stone in unfabricated form. We held that even if the owner of the granite were to tie its quarrying and fabricating operations, no actual or attempted monopolization claim would be stated. In writing for the Court, Judge Friendly observed that such a case possessed only the "trappings" of an antitrust action.[1]

As was true in *Rock of Ages,* we find this case to be "essentially a private squabble between two ... energetic ... businessmen," rather than an attack on monopolistic practices. Indeed nothing that transpired between Tremco's officers and Georgia State officials strikes us as anticompetitive. In seeking to convince Broome to employ resaturant coating instead of replacing the buildings' roofing (and of course to favor Tremco's products over its rivals), Helman's actions exemplified those expected of an aggressive sales representative. Such solicitations promote rather than hinder competition. Indeed, Tremco's profits were obtained by commercial initiative and skillful marketing. The possibility of using an alternative restorative method would not have come to Broome's attention were it not for the literature he received

---

**1.** Triple M's reliance on *United States v. Klearfax Linen Looms Inc.,* 63 F.Supp. 32 (D.Minn. 1945), is misplaced. That case involved a requirements contract rather than merely an agreement to furnish materials for a single job, and was explicitly so distinguished by this Court in *H.E. Fletcher Co. v. Rock of Ages Corp., supra,* 326 F.2d at 17.

from and the discussions he held with Helman. We see no reason to deny spoils fairly won in the marketplace.

Neither do we believe the inclusion of proprietary specifications in the bid documents endangered the competitive process. The ultimate purchaser, user, and beneficiary of Tremco's product was, of course, the State of Georgia. The Department of Agriculture was free to hire only those contractors who would agree to employ a particular brand of resaturant coating.

*The Section 1 Claims*

Because Triple M alleges two very distinct types of anticompetitive conspiracies proscribed by Section 1 of the Sherman Act, we find it necessary to deal with each one separately. We first address whether Section 4 of the Clayton Act affords Triple M the opportunity to seek a judicial remedy against Tremco for its alleged conspiracy with Triple M's competitors.[2]

■ Antitrust standing and its terminological cousin, antitrust injury, are often confused. Both concepts, however, share a common ingredient, "confin[ing] recovery to those who have been injured by restraint on competitive forces in the economy." *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752, 758 (2d Cir.1972); *see also* Note, *Antitrust Standing, Antitrust Injury and the Per Se Standard*, 93 Yale L.J. 1309, 1310 (1984) (advocates examining market effects rather than peculiar circumstances of plaintiff's injury). Relevant components of the standing inquiry include the indirectness of the asserted injury, the speculative nature of the damage theory, the risk of duplicative recoveries and the danger of complex apportionment, *see Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 525, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983). By contrast, the parameters of the anitrust injury analysis are more limited, examining only whether a plaintiff's loss is "of the type the antitrust laws were intended to prevent and that flows from that which makes [a

defendant's] act unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ In light of these principles, we hold that Triple M could not bring an action for Tremco's purported agreement with roofing contractors. Tremco allegedly engaged in a conspiracy with roofing contractors to inflate the price of Tremco products. Triple M contends that because its bid was predicated on the fallacious assumption that resaturant coating would be priced competitively, it bid too low and therefore suffered injury. In effect, Triple M is complaining because it won the Farmers Market job. In addition to the bizarre nature of this claim, it is also too speculative a theory upon which to base damages, *see Blue Shield of Virginia v. McCready*, 457 U.S. 465, 467, 476–78, 102 S.Ct. 2540, 2542, 2547–48, 73 L.Ed.2d 149 (1982). Moreover, if Triple M's rivals had illegally enhanced their bids by incorporating Tremco's inflated prices, it was the State of Georgia—as the party required to pay an inflated price for the project—that was directly injured. The proscription against price fixing was not intended to forestall injury of the type Triple M alleged.

■ As the direct purchaser of Tremco's products, Triple M enjoys standing to recover damages to the extent any conspiracy between Tremco and the Department of Agriculture resulted in Triple M being overcharged for resaturant coating. *See Hanover Shoe v. United Shoe Mach.*, 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968).

In reaching then, as we must, the merits of this claim, we find no support in the record indicating any agreement, discussion or even implied communication concerning prices transpired between Helman and Broome. As we noted earlier, the inclusion of proprietary specifications did not in this instance compromise free and unfet-

---

2. Section 4 of the Clayton Act, 15 U.S.C. § 15 (1982), provides in pertinent part that, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and should recover threefold the damages by him sustained."

tered competition in the roofing materials industry.[3]

### III.

For the reasons set forth above, the judgment of the district court is affirmed.[4]

---

**3.** Nor does any support exist for Triple M's assertion that Assistant Commissioner Bridges denied its substitution request as part of some commitment to Tremco or to Triple M's competitors. Bridges's justification—allowing substitution would be unfair to those contractors that had relied on the specifications—remains uncontroverted. Indeed, we will never know whether substitution would have been permitted, for Triple M failed to follow the procedures to which it had promised to adhere.

**4.** Because we hold that summary judgment was properly granted substantially for the reasons stated by the district court, we decline to address whether Triple M's action should have been dismissed pursuant to the *Noerr-Pennington* doctrine. We note only that this Court has yet to decide whether the antitrust laws are applicable to anticompetitive activity directed at government agencies acting in a proprietary capacity. *See Litton Systems, Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 805 n. 28 (2d Cir.1983).