

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2004

# 2660 Woodley Road v. ITT Sheraton Corp

Precedential or Non-Precedential: Precedential

Docket No. 02-1297

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"2660 Woodley Road v. ITT Sheraton Corp" (2004). *2004 Decisions.* Paper 648.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/648

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-1297/1418

2660 WOODLEY ROAD JOINT
VENTURE;
WOODLEY ROAD ASSOCIATES,
INC.;
JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY;
*SUMITOMO LIFE REALTY (N.Y.)
INC.

v.

ITT SHERATON CORPORATION;
SHERATON OPERATING
CORPORATION;
WASHINGTON SHERATON
CORPORATION**

ITT Sheraton Corporation,
Sheraton Operating Corporation and
Washington Sheraton Corporation,**

Appellant No. 02-1297

(*Dismissed per the Clerk Order of
5/23/02)
(**Dismissed per the Court Order of
9/25/02)

2660 WOODLEY ROAD JOINT
VENTURE;

WOODLEY ROAD ASSOCIATES,
INC.;
JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY;
*SUMITOMO LIFE REALTY (N.Y.)
INC.

Appellants No. 02-1418

v.

ITT SHERATON CORPORATION;
SHERATON OPERATING
CORPORATION;
WASHINGTON SHERATON
CORPORATION**

(*Dismissed per the Clerk Order of
5/23/02)
(**Dismissed per the Court Order of
9/25/02)

On Appeal From the United States
District Court
For the District of Delaware
(D.C. Civ. No. 97-cv-00450)
Chief District Judge: Hon. Joseph J.
Farnan, Jr.

**ARGUED: FEBRUARY 13, 2003**

BEFORE: ALITO and McKEE,
Circuit Judges, and SCHWARZER,[*]
Senior District Judge

---

[*]Honorable William W. Schwarzer,
Senior United States District Judge,
Northern District of California, sitting by
designation.

(Filed: May 25, 2004)

ANDREW L. FREY (ARGUED)
Mayer, Brown, Rowe & Maw
1675 Broadway
New York, NY 10019

EVEN M. TAGER
ROBERT L. BRONSTON
Mayer, Brown, Rowe & Maw
1909 K Street, N.W.
Washington, D.C. 20006

*Attorneys for Appellants/Cross-Appellees
ITT Sheraton Corporation and Sheraton
Operating Corporation*

THOMAS A. ARENA (ARGUED)
WILLIAM E. WALLACE, III
TIMOTHY P. WEI
Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza

New York, NY 10005

*Attorneys for Appellees/Cross-Appellants
2660 Woodley Road Joint Venture;
 John Hancock Mutual Life Insurance
Company;
and Sumitomo Life Realty (N.Y.) Inc.*

---

OPINION OF THE COURT

---

McKEE, Circuit Judge.

We are asked to review the propriety of damage awards, including an award for punitive damages, in an action for commercial bribery under § 2(c) of the Robinson-Patman Act, racketeering under the Racketeer Influenced Corrupt Organization Act ("RICO"), breach of contract and related state law claims. We hold that the plaintiff can not maintain an action under § 2(c) of the Robinson-Patmam Act because it has not established antitrust standing. We also hold that the record does not support portions of other damage awards, including the award for punitive damages, as explained more fully below. Accordingly, we will affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

John Hancock Life Insurance Company, 2660 Woodley Road Joint Venture and Woodley Road Associates, Inc. (collectively referred to as "Hancock") together owned the Sheraton Washington Hotel (the "Hotel"). In September 1979, Hancock entered into a Management Agreement under which Sheraton agreed to act as Hancock's agent in managing the Hotel's operations. In return, Sheraton received a percentage of the Hotel's gross revenue and a share of its net cash flow.

The suit arises from an arrangement known as the "Sheraton Purchasing Resource" program (the "SPR") that was initiated pursuant to the terms of the Management Agreement. Pursuant to the terms of the SPR program, Sheraton

negotiated large-volume discounts with vendors seeking to supply Sheraton-managed hotels. Sheraton then required the vendors to add a surcharge to the price billed to the individual hotels for each purchase. However, the surcharge was not itemized, or even disclosed, on any bills or invoices that vendors sent to individual hotels. Rather, the surcharge was remitted directly to Sheraton in the form of a "rebate." The Management Agreement provided that Sheraton was entitled to be reimbursed for the costs of providing these services. Sheraton claimed that these rebates reimbursed it for the centralized purchasing services it provided under the SPR program as well as associated overhead costs.

The Management Agreement between Sheraton and Hancock remained in effect until 1993, when differences between the parties led to its termination. Thereafter, Hancock filed this lawsuit. In its complaint, Hancock alleged: violations of § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c); violations of RICO, 18 U.S.C. § 1961; and state law claims of breach of contract, breach of fiduciary duty, and breach of the implied duty of good faith and fair dealing; as well as fraud, and intentional or negligent misrepresentation. Hancock also claimed that Sheraton failed to properly act as its agent in operating its reservation system, failing to limit usable denials,[1] improperly profiting from providing Workers' Compensation insurance, permitting excessive numbers of complimentary rooms, and breaching other unspecified contractual duties.

Hancock's suit proceeded to trial where a jury found for Sheraton on Hancock's RICO claim, but found for Hancock on its Robinson-Patman Act claim. The jury also found for Hancock on several of its state law claims, including claims that Sheraton had breached the Management Agreement with regard to purchasing services, and providing Workers Compensation insurance. The jury further found in favor in Hancock on its breach of fiduciary duty claim. The jury concluded that Sheraton breached an implied duty of good faith and fair dealing, and that Sheraton was liable for its misrepresentations to Hancock. The jury awarded damages of $750,000 on the Robinson-Patman Act claim (subsequently trebled by the court), a total of $10,732,000 on the breach of contract claims, $1,100,000 on the tort claims, and $37,500,000 in punitive damages. The district court denied Sheraton's motion for judgment as a matter of law but granted a remittitur thereby reducing the punitive damages to $17,415,000. The district court then entered judgment in favor of Hancock in the total amount of $31,497,000, but denied Hancock's motion for attorneys' fees and taxation of costs without prejudice. Sheraton appealed

---

[1] According to Sheraton, a usable denial occurs when a potential guest is denied a reservation when a room is actually

available. Sheraton's Br. as appellant/cross-appellee, at 13.

from the judgment, and Hancock cross-appealed from the remittitur.[2]  For the reasons that follow, we will affirm in part and reverse in part.

## II. DISCUSSION

## A.    ROBINSON-PATMAN ACT CLAIM

### *Hancock's Antitrust Standing*

Sheraton renews its argument that Hancock lacks antitrust standing to bring a claim under § 2(c) of the Robinson-Patman Act.[3]  We must address that issue before addressing the merits of the appeal or cross-appeal.

Section 2(c) of the Robinson-Patman Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).  "Congress enacted section 2(c), the Act's brokerage provision, primarily to curb one particular abuse by large chain store buyers, namely the use of 'dummy' brokerage fees as a means of securing price rebates." *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1066 (3d Cir. 1988) (citation omitted).  This concern arose from large stores using their economic dominance to force sellers to pay a fee for doing business.  "The large stores required the sellers to pay a 'brokerage' to persons employed by the buyers.  These persons had rendered no service, and would simply pay over the commissions to their employers." *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 371 (3d Cir. 1985).

However, Hancock's § 2(c) claim is not a dummy brokerage claim.  Rather, Hancock has fashioned its § 2(c) action as

---

[2] We have jurisdiction under 28 U.S.C. § 1291.

[3] The Robinson-Patman Act of 1936 was enacted as an amendment to the Clayton Act. *Great Atlantic & Pacific Tea Co. v. Federal Trade Commission*, 106 F.2d 667, 669 (3d Cir. 1939).

4

a commercial bribery claim.[4]

Surprisingly, the Supreme Court has never decided a § 2(c) commercial bribery case. However, in *dicta* in *Federal Trade Commission v. Henry Broch, Inc.*, 363 U.S. 166 (1960), the Court noted that § 2(c) does encompass commercial bribery. *Id.* at 169 n.6 ("And although not mentioned in the Committee Reports, the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer.") (citation omitted).[5] Similarly,

---

[4]Sheraton insists that the SPR program was not commercial bribery because the rebates simply served to compensate it for the costs it incurred in operating the program. Nevertheless, it accepts Hancock's characterization of the SPR program as commercial bribery for purposes of this appeal.

As a general principle, a critical element of commercial bribery is the breach of the duty of fidelity. For example, the Model Penal Code provides:

**Commercial Bribery and Breach of Duty to Act Disinterestedly.**

(1) A person commits a misdemeanor if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as:
(a) partner, agent, or employee of another;
(b) trustee, guardian, or other fiduciary;
(c) lawyer, physician, accountant, appraiser, or other professional adviser or informant;
(d) officer, director, manager or other participant in the direction of the affairs of an incorporated or unincorporated association; or
(e) arbitrator or other

purportedly disinterested adjudicator or referee.

(2) A person who holds himself out to the public as being engaged in the business of making disinterested selection, appraisal, or criticism of commodities or services commits a misdemeanor if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism.
(3) A person commits a misdemeanor if he confers, or offers or agrees to confer, any benefit the acceptance of which would be criminal under this Section.

MODEL PENAL CODE § 224.8. *See United States v Dischner*, 960 F.2d 879 (9th Cir. 1992).

[5]In *Broch* a manufacturer sold apple concentrate at a price of $1.30 a gallon.

in *dicta* in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), the Court again noted that "bribery of a public purchasing agent may constitute a violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act." In addition, a number of courts of appeals have held that § 2(c) encompasses commercial bribery.[6]

The manufacturer sold through a broker and paid the broker a commission of 5%. One buyer would not pay more than $1.25 for the concentrate and the manufacturer refused to lower his price unless the broker agreed to take a cut in his commission from 5% to 3%. The broker agreed and the sale was consummated at $1.25 with a lower commission. The Court viewed this transaction as identical to one in which the broker received a commission of 5%, the normal commission, and then turned over a part of the commission, i.e., 2%, to the buyer. That would have been illegal under § 2(c) as a payment in lieu of brokerage and, therefore, the Court found that the reduction in commission in *Broch* was also a payment in lieu of brokerage.

[6] *See, e.g., Harris v. Duty Free Shoppers Ltd. Partnership,* 940 F.2d 1272 (9th Cir. 1991); *Stephen Jay Photography, Ltd. v. Olan Mills*, 903 F.2d 988 (4th Cir. 1990); *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266 (5th Cir. 1979); *Grace v. E.J. Kozin*, 538 F.2d 170 (7th Cir. 1976); *Calnetic Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir. 1976); *Rangen, Inc. v. Sterling Nelson & Sons*, 351 F.2d 851 (9th Cir. 1965); *Fitch*

Although we once expressed skepticism about "whether Congress intended to sweep commercial bribery within the ambit of § 2(c)," *Seaboard Supply*, 770 F.2d at 371, we have since agreed that "commercial bribery is actionable under 2(c)." *Environmental Tectonics*, 847 F.2d at 1066.

Nevertheless, although § 2(c) of the Robinson-Patman Act defines certain conduct as illegal, it does not create a private right of action to sue for damages resulting from violations of the Act. Rather, the private right of action for a § 2(c) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act. *Genesco, Inc. v. T. Kakuichi & Co.*, 815 F.2d 840, 853 (2d Cir. 1987). Section 4 of the Clayton Act provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit,

*v. Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12 (6th Cir. 1943).

including a reasonable attorney's fee.

15 U.S.C. § 15(a). However, in order to recover treble damages under § 4(a) of the Clayton Act, a private plaintiff must do more than simply show "an injury causally linked to" a violation of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A plaintiff must also prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* Thus, the Court pronounced in *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 568 (1981), "even if there has been a violation of the Robinson-Patman Act, [a plaintiff] is not excused from its burden of proving antitrust injury and damages."

As noted above, the Supreme Court has not yet defined "antitrust injury," for purposes of a § 2(c) Robinson-Patman claim. However, Hancock argues that it suffered antitrust injury as a result of Sheraton's commercial bribery scheme, *i.e.*, the SPR program. Hancock refers to this program as a "kickback" and claims that Sheraton inflated Hancock's purchasing costs by adding SPR surcharges and then collecting the increased costs in the form of the rebates it collected from Hancock's vendors. According to Hancock, it suffered antitrust injury because it could only purchase goods from vendors participating in Sheraton's SPR program, and it had to pay these artificially inflated prices for goods

purchased through that program. Hancock also argues that the increased cost put it at a competitive disadvantage with regard to hotels owned by Sheraton.

However, we do not think that paying inflated purchasing prices to vendors, without more, is "an injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes the defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. Rather, Hancock's injury was caused by a breach of contract and the corruption of the principal-agent relationship. We agree that, in an appropriate case, a breach of contract or a breach of fiduciary duty could result in the kind of injury "the antitrust laws were intended to prevent." However, we do not believe that Hancock has established such an injury here. The absence of such injury is fatal to Hancock's attempt to establish antitrust standing.[7]

---

[7] As noted above, Sheraton manages the Hotel under contract with Hancock. However, Sheraton also manages hotels that it actually owns. Hancock also alleges that the rebate scheme put it at a competitive disadvantage to Sheraton-owned hotels because. According to Hancock, "the rebate scheme impacted the Hotel differently than it did Sheraton-owned hotels: The rebate program increased the costs of the goods and services [Hancock] purchased on behalf of the Hotel, whereas the rebate scheme did not impose a real cost on Sheraton-owned hotels, which simply 'paid' the kickback to their corporate parent."

"Antitrust standing and its terminological cousin, antitrust injury, are often confused." *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 247 (2d Cir. 1985). "Lack of standing and antitrust injury often have been invoked interchangeably against a plaintiff even though each concept involves a distinct element of the § 4 action." *Greater Rockford Energy and Technology Co. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). Part of this confusion may result from the ease with which antitrust injury and competitive injury can be conflated into a single inquiry.[8]

Hancock's Br. at 23.

However, Sheraton argues that Hancock produced no evidence that Hancock was put at a competitive disadvantage vis-a-vis Sheraton-owned hotels because the evidence established that there are no Sheraton-owned hotels in the Washington, D.C. area where the Hotel does business. Sheraton's Br. at 26. Absent any such competition, Sheraton argues, Hancock could not have been put at a competitive disadvantage by the surcharge and therefore could not have sustained a competitive injury because of it.

[8]The difficulty in distinguishing these two interrelated concepts was summed up by the district court in *Wilson v. Ringsby Truck Lines, Inc.*, 320 F.Supp. 699, 700 (D. Colo. 1970). There the court candidly noted, "[w]e must confess at the outset that we find antitrust standing cases more than a little confusing and certainly beyond

It is now settled that a § 2(c) plaintiff does not have to prove competitive injury to establish a § 2(c) violation. In *Federal Trade Commission v. Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959), the Supreme Court noted, *inter alia*, that § 2(c) of the Robinson-Patman Act makes the business practices described therein unlawful. Therefore, "the proscriptions [of § 2(c)] are absolute. . .[and § 2(c) does not] require[], as proof of a *prima facie* violation, a showing that the illicit practice has had an injurious or destructive effect on competition." *Id*. Accordingly, "the presence of an anti-competitive effect is not necessary to prove a violation of section 2(c)." *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 371 n.3 (3d Cir. 1985). The anti-competitive effect is the presumed result of the illegal conduct.

However, the successful plaintiff must still prove more than a § 2(c) violation and the accompanying anti-competitive effect to prevail. The plaintiff must also establish the requisite antitrust *injury*, and this requires more than establishing the anti-competitive effect that is endemic in the violation. In other words, the mere fact that certain conduct

our powers of reconciliation." A commentator subsequently noted that the "court could hardly have been faulted, for the confusion it noted has been endemic to these cases since the creation of the treble-damages action." Daniel Richman, Note, *Antitrust Standing, Antitrust Injury, and the Per Se Standard*, 93 Yale L. J. 1309 (1984).

has an anticompetitive effect does not mean that a given plaintiff has suffered an antitrust injury, or that a given plaintiff is the appropriate party to seek recovery under the antitrust laws. Accordingly, "[e]ven a plaintiff who can show antitrust injury may lack antitrust standing. . . ." *Barton & Pittinos, Inc., v. Smith Kline Beechum Corp*., 118 F.3d 178, 182 (3rd Cir. 1997). The Supreme Court explained this in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983). There, the Court said:

> [a] literal reading of [§ 4 of the Clayton Act] is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Some of our prior cases have paraphrased the statute in an equally expansive way. But before we hold that the statute is as broad as its words suggest, we must consider whether Congress intended such an open-ended meaning.

*Id*. at 529-30 (footnote omitted). *Associated General Contractors* involved a number of carpenters' unions that alleged that Associated General Contractors, a trade association made up of general contractors, had coerced customers and competing contractors to give some of their business to non-union contractors.[9] Plaintiffs alleged that the coercion resulted in less business for firms employing union carpenters. The Court held that because the carpenters' unions were "neither a consumer nor a competitor in the market in which trade was constrained," their injuries were not the type of injury that the antitrust laws were designed to prevent. *Id*. at 539. The carpenters' unions may well have had a cause of action under other statutes or common law, and a different plaintiff may have had a cause of action under the antitrust statues. However, the carpenters' unions had no standing to sue under those laws. The Court reached this conclusion even though the Association's conduct had an anticompetitive effect. Moreover, firms hiring union carpenters had clearly suffered an anticompetitive injury because the Association's coercion made it more difficult for those firms to win contracts. Yet, notwithstanding the anticompetitive effect of the conduct in question, the Court concluded that the plaintiff carpenters' unions had not suffered a sufficient antitrust injury.

In arriving at that decision, the Court read the antitrust statues in light of their common law background and read a "proximate cause element into § 4 [Clayton Act] actions." *Greater Rockford Energy*, 998 F.2d at 394. As a result of *Associated General Contractors*, § 4 of the Clayton Act has been given a narrowed

---

[9] The Association's customers included landowners who needed construction services.

reading. We have

> synthesized the Court's analysis into the following formulation of the factors that are relevant in an antitrust standing challenge:
>
> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Barton & Pittinos,* 118 F.3d at 181 (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)). The traditional concept of antitrust injury continues to be an important part of antitrust standing under this formulation. It is subsumed within the second factor of the 5 prong inquiry (i.e. "whether the plaintiff's alleged injury is . . . the type . .

. the antitrust laws were intended to [remedy]"). *City of Pittsburgh v. West Penn Power Comp.*, 147 F.3d 256, 264 (3d Cir. 1998). "The antitrust standing inquiry is not a black-letter rule, but rather, [it] is essentially a balancing test comprised of many constant and variable factors." *Id.*, at 264-5 (internal quotation marks omitted).

Antitrust injury thus becomes but one element of the inquiry into antitrust standing. It is "a necessary but insufficient condition of antitrust standing." *Barton & Pittinos*, 118 F.3d at 182 (citing *Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1166). Therefore, as noted above, "[e]ven a plaintiff who can show antitrust injury may lack antitrust standing, because the remaining [*Associated General Contractors*] factors may weigh against allowing him or her to sue under the antitrust laws."[10] *Id.* (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986)).

-----

[10]The antitrust injury requirement of the antitrust standing inquiry is analogous to the minimum standing requirement of a case or controversy within the meaning of Article III, § 2 of the Constitution, while the other *Associated General Contractors* factors are analogous to the prudential limitations on standing. *Barton & Pittinos*, 118 F.3d at 182 n.4; *City of Pittsburgh*, 147 F.3d at 264. [*See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Incorp.*, 140 F.3d 478, 484-85 (3d Cir. 1998), for a discussion of Article III standing and the prudential limitations on standing.]

"The *Associated General* test has been regularly and consistently applied as the passageway through which antitrust plaintiffs must advance." *City of Pittsburgh*, 147 F.3d at 264. Accordingly, even if we assume *arguendo* that Hancock suffered an antitrust injury because it paid inflated prices as a result of Sheraton's alleged commercial bribery, that would not necessarily establish Hancock's antitrust standing. Hancock must still navigate through the course defined by *Associated General*. Yet, it can not successfully do that on this record because it can not circumnavigate the barrier posed by *Associated General* factors (1), (3), (4) or (5). With regard to factors (1)[11] and (3),[12] we think it is important to remember that Sheraton contends that the surcharge and rebate aspects of the SPR program was not commercial bribery at all, but simply a way for it to recoup the costs it incurred in administering the program. Even if Sheraton inflated the amount of those charges beyond that which was necessary to recoup its costs, the propriety of Hancock maintaining an antitrust action is still problematic for reasons we will elaborate upon below.

Even if we assume Hancock is correct as to factors (1) and (3), it surely can not survive an inquiry under factor (4)[13] because there are clearly "more direct victims" of Sheraton's alleged commercial bribery scheme. Vendors who may have been prevented from selling goods to Hancock because they refused to participate in the SPR program of surcharges and rebates are far more direct victims of Sheraton's scheme than Hancock. Moreover, their injury is much closer to the kind of injury antitrust laws address because the displaced vendors were unable to participate in the market created by the SPR program. Significantly, Hancock comes close to conceding as much in its complaint. Hancock alleges:

> [v]endors unwilling to pay kickbacks to Defendants were competitively harmed, and by mandating the Hotel's participation in national and regional contracts negotiated by [Sheraton], Defendants denied [Hancock] the opportunity to obtain advantageous prices and terms from non-participating vendors. Favored vendors not only drew sales or profits from non-favored vendors, but the attendant reduction in competition and higher costs resulted in direct antitrust injury to [Hancock].

---

[11] "The causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm[.]"

[12] "The directness of the injury. . . ."

[13] "The existence of more direct victims of the alleged antitrust violations[.]"

Complaint at ¶ 143.

Although Hancock does allege that it suffered an anticompetitive injury by being forced to pay higher prices as a result of reduced competition, we think Hancock is in an analogous situation to the carpenters' unions in *Associated General Contractors*. There, customers suffered a more direct and more appropriate antitrust injury even though the alleged antitrust violation had an effect on the carpenters' union. There is an analogous situation here if we compare the injury of the excluded vendors to Hancock's injury.

Unlike the Sherman Act, which "protects *competition*, not *competitors*, . . . the Robinson-Patman Act extends its protection to competitors." *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 528 (1st Cir. 1989) (emphasis in original). We think our discussion in *Environmental Tectonics* is therefore also quite helpful to this analysis. There, a company bribed foreign officials in order to receive a contract to supply aircraft equipment to the foreign government's air force, and a competitor brought a § 2(c) commercial bribery claim.[14] The district court dismissed the action in its entirety on the basis of the act of state doctrine.[15] We

reversed because we concluded that the act of state doctrine did not apply.[16] In doing so, we noted the difficulty of precisely defining standing under § 2(c). 847 F.2d at 1066. We also noted that "it is generally agreed that a direct competitor of a company that obtains a contract through commercial bribery has standing to press a 2(c) claim against the briber." *Id.* (citations omitted). Admittedly, we did not limit the class of potential § 2(c) commercial bribery plaintiffs to disfavored competitors. However, we mentioned disfavored competitors having § 2(c) commercial bribery standing after stating: "[I]n order to proceed with a claim, a plaintiff must be able to demonstrate that it is within the class of those injured in their business or property, who, based on a variety of factors, are best suited to further the purposes of the statute by remedying the violation alleged." *Id.* at 1066 (citing

when a United States court appears to sit in judgment on a foreign state's regulation of its internal affairs. Under the doctrine, the courts of this country will refrain from judging the validity of a foreign state's governmental acts in regard to matters within that country's borders. The party moving for the doctrine's application has the burden of proving that dismissal is an appropriate response to the circumstances presented in the case." *Environmental Tectonics*, 847 F.2d at 1057-58 (citations omitted).

[16]As noted, we also held that commercial bribery is actionable under § 2(c). 847 F.2d at 1066.

---

[14] The suit involved several claims in addition to the § 2(c) commercial bribery claim. However, the other claims are not relevant to the issues here.

[15]"The doctrine is the judiciary's institutional response to the foreign relations tensions that can be generated

12

*Alberta Gas Chemicals, Ltd. v. E. I. DuPont De Nemours and Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987)). Significantly, the portion of the *Alberta Gas Chemicals* opinion we cited discusses both *Brunswick* and *Associated General.*

Moreover, even if we focus on Hancock's allegation that it had to pay inflated prices because it was forced to purchase only from "favored vendors," and ignore Hancock's admission that "[v]endors unwilling to pay kickbacks . . . were competitively harmed[,]" we would still conclude that Hancock can not establish antitrust standing under the fifth factor in the *Barton & Pittings* analysis. That requires us to consider whether an award of antitrust damages would be duplicative, and Hancock's antitrust recovery is inextricably intertwined with its awards on the breach of contract and breach of fiduciary duty claims.

As noted above, Hancock asserted a number of state law claims arising from the SPR program. The jury found that Hancock suffered $250,000 in damages related to the purchasing services program and it also awarded $1,100,00 for Sheraton's breach of fiduciary duty. The actions supporting those awards constitute breach of contract and breach of fiduciary duty. Allowing a separate recovery under § 2(c) creates insurmountable problems in apportioning damages along with the real possibility of cumulative damages.[17]

Accordingly, we hold that Hancock does not have antitrust standing to pursue its § 2(c) Robinson-Patman Act claim. We will therefore vacate the award of $750,000 (subsequently trebled by the district court) on that claim.

## B. BREACH OF THE AGENCY PROVISION OF THE MANAGEMENT AGREEMENT

### *Sufficiency of the Evidence.*

Sheraton claims that there is insufficient evidence to sustain the award of $10,260,000 for breach of the agency provision of the Management Agreement. Sheraton maintains that there is no evidence of harm for that breach that is not also captured in the itemization of possible damages set forth in the jury interrogatories on the verdict form. On that form, the jury awarded $10,260,000 for breach of the agency provision, and also separately awarded $250,000 for purchasing services and $222,000 for Workers' Compensation. It awarded no damages for the other categories listed on the verdict form: the frequent traveler program, the reservations system, "usable denials" practices, complimentary rooms practices, or for any other contractual duty. The relevant interrogatory asks jurors: "[w]hat damages, if any, do you award to plaintiffs for a breach of the Management Contract concerning each of the following. . . ."

Hancock responds by arguing that

---

[17] Indeed, given the nature of Hancock's claimed damages, duplicative recovery is not only possible, it is

exceedingly probable if not inevitable.

the evidence of the breach of the agency provision extended beyond the rebate payments, and suggests several possible bases for the $10,260,000 award. We are not persuaded. For example, Hancock relies upon the Workers' Compensation program. However, as noted, the jury separately awarded $222,000 for that program. Hancock cites the level of usable denial practices and the frequent travelers program, which were itemized on the verdict form. However, the jury awarded no damages for them. Hancock also cites an unexplained and unquantified item that it refers to as a bogus relocation expense. However, no such item was listed on the verdict form. Lastly, Hancock argues that Sheraton swept certain of its bank accounts and claims that also supported an award of damages. However, the sweeping of accounts occurred after termination of the agency provision. Thus, none of those explanations supports awarding $10,260,000 for breach of the agency provision. Alternatively, Hancock contends that the jury could have awarded damages on the theory that a fiduciary breach entitled Hancock to disgorgement of the fees it paid to Sheraton over the life of the Management Agreement. Hancock claims that the award of $10,260,000 represents 15% of the $68,400,000 Hancock paid. Citing the Restatement (Second) of Agency, § 469, Hancock suggests that Sheraton lost its right to compensation because it wilfully breached its contractual obligations and that disgorgement is an appropriate remedy for fiduciary breach. We disagree.

First, the jury made no finding of wilful breach of contract and it was never instructed on applying principles of disgorgement. Second, the jury verdict includes a specific finding for breach of fiduciary duty and the jury listed an amount of $1,100,000 as damages for that breach. Accordingly, we find no support for the award of $10,260,000, and will therefore vacate that award.

## C. PUNITIVE DAMAGES

Sheraton challenges the punitive damage award on several grounds. It argues that the award was not supported by clear and convincing evidence, that the relevant jury instructions were erroneous, and that the award was excessive.

Sheraton argues on appeal that the District of Columbia standard of proof on Hancock's punitive damages claim applies and that, under that standard, punitive damages can be awarded "only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." *Johanthan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995). Hancock argues otherwise and claims that Delaware law governs the standard of proof and, under that standard, the preponderance of evidence standard applies to punitive damages. *See Cloroben Chem. Corp. v. Comegys*, 464 A.2d 887, 891 (Del. 1983).

The district court instructed the jury that it must find the elements of punitive damages by a preponderance of the evidence. Sheraton did not object to that

instruction. We have held that this type of error is fundamental error entitling a defendant to a new trial; it is not subject to waiver. *Beardshall v. Minuteman Press Int'l, Inc.*, 664 F.2d 23 (3d Cir. 1981). However, Sheraton submitted proposed jury instructions that did not include an instruction that entitlement to punitive damages must be established by clear and convincing evidence. Therefore, assuming that the instruction was wrong, it was tantamount to invited error. *U.S. v. West Indies Transport, Inc.*, 127 F.3d 299, 306 (3d Cir. 1997) (holding that error in challenged jury instruction was invited, and thus did not provide basis for reversal, when defendants failed to request instruction that they asserted on appeal and their proposed instruction was remarkably similar to that actually given).

In ruling on Sheraton's post-trial motion, the district court determined the amount of the punitive damages to be $11,610,000. That included the award of $10,260,000 for breach of the agency agreement. Since we are vacating the award for breach of the agency agreement, we must concomitantly reduce the punitive damage award so that it only reflects the surviving damages – $250,000 for purchasing activities, and $1,100,000 for common law damages, or $1,350,000.[18] In granting the remittitur, the district court

determined that punitive damages should be one and one-half times the relevant compensatory damages. We adopt that ratio for the purpose of calculating the judgment on remand for several reasons.

We review a grant of remittitur for abuse of discretion. *Gumbs v. Pueblo Int'l*, 823 F.2d 768, 771 (3d Cir. 1987). We also afford the district court's assessment of punitive damages a degree of deference since that court is familiar with the evidence. *See Keenan v. City of Philadelphia*, 983 F.2d 456, 472 (3d Cir. 1992) . Moreover, although Hancock has cross-appealed from the grant of the remittitur, neither party has taken issue with the district court's ratio.[19] Accordingly we will reduce the punitive damage award to $2,025,000.

## IV. CONCLUSION

For the reasons stated above, we will vacate the award of $750,000 for violation of the Robinson-Patman Act, as subsequently trebled by the trial court to $2,250,000; as well as the award of $250,000 for purchasing services, and the $10,260,000 award for breach of the agency agreement. We will affirm the awards of $222,000 for Workers' Compensation; and $1,100,000 for breach of fiduciary duty, breach of the implied

---

[18]The district court noted that plaintiffs did not specify an amount for breach of Workers' Compensation in their computation of relevant compensatory damages, and it therefore did not include that amount in its calculation.

[19]*See State Farm Mut. Automobile Ins. Co. v. Campbell,* U.S.Sup.Ct.No. 01-1289 (April 7, 2003) (stating that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

duty of good faith and fair dealing, and intentional or negligent misrepresentation. We will reduce punitive damages to $2,025,000, for reasons already stated. We remand to the district court with direction to enter judgment consistent with this opinion and for further appropriate proceedings.[20]

---

[20] We have considered the remaining contentions of the parties and conclude that we can affirm the district court's rulings on those issues without further discussion.